**David JESIONOWSKI, Plaintiff,**

v.

**William J. BECK, Denis J. Pierce, Thomas J. Burke, all individually and as police officers in the Police Department of the City of Lawrence, City of Lawrence, Defendants.**

Civil Action No. 94–10434–MLW.

United States District Court,
D. Massachusetts.

Sept. 13, 1996.

James B. Krasnoo, Andover, MA, for Plaintiff.

John F. Farraher, Grady and Dwyer, Boston, MA, David C. Jenkins, Dwyer & Jenkins, Boston, MA, for William J. Beck, Denis J. Pierce, Thomas J. Burke.

Robert J. O'Sullivan, Office of the City Attorney, Lawrence, MA, for City of Lawrence.

***MEMORANDUM AND ORDER ON MOTION OF DEFENDANT, WILLIAM J. BECK, FOR SUMMARY JUDGMENT (# 32), MOTION OF DEFENDANT, DENIS J. PIERCE, FOR SUMMARY JUDGMENT (# 33) AND MOTION OF THE DEFENDANT, THOMAS J. BURKE, FOR SUMMARY JUDGMENT (# 34)***

COLLINGS, United States Magistrate Judge.

## I. INTRODUCTION

The plaintiff, David Jesionowski (hereinafter "Jesionowski"), filed a six-count complaint against defendants William J. Beck (hereinafter "Beck"), Denis J. Pierce (hereinafter "Pierce"), and Thomas J. Burke (hereinafter "Burke"), individually and as police officers in the Police Department of Lawrence[1], alleging claims of civil rights violations under 42 U.S.C. § 1983 (Counts I[2]),

---

1. Defendant, the City of Lawrence, previously filed a motion to dismiss (# 4) with respect to the sole count in which it is named, i.e., Count III, contending that the complaint failed to allege claims against it for which relief can be granted; the motion was denied. (# 12) The City is not a party to the motions for summary judgment.

2. The plaintiff also seeks an award of fair and reasonable attorney's fees pursuant to 42 U.S.C. § 1988 under Count I of the complaint.

conspiracy to conceal civil rights violations under 42 U.S.C. § 1985 (Count II), and assault and battery under the laws of Massachusetts (Counts IV, V, and VI). Following extensive discovery these three defendants, Beck, Pierce, and Burke, filed motions for summary judgment (## 32–34) seeking the entry of judgment as a matter of law on Counts I, II, IV, V, and VI of the complaint. The plaintiff opposes the dispositive motions (# 46), and, following oral argument, the motions for summary judgment are ripe for decision.[3]

## II. FACTS

On March 18, 1991, at approximately 9:30 p.m., Jesionowski was travelling on Canal Street in Lawrence, Massachusetts, in a stolen blue Ford Taurus when he was pulled over by a police cruiser. (# 46, ex. B, Jesionowski's Answer to Interrogatory No. 2, "Jes. Ans. Int. No. __") As the police officers exited the cruiser to approach Jesionowski's vehicle, he drove off down Canal Street[4]. Jesionowski continued down Canal Street, took a left turn and proceeded south on Broadway. (# 46, ex. A, Jesionowski's Deposition on 11/2/94 at 110, "Jes. Dep. 11/2/94 at __")

With the police cruiser in pursuit, Jesionowski was driving down Broadway when his car skidded and hit an abutment of a bridge. (# 46, ex. B, Jes. Ans. Int. No. 2) Jesionowski was not hurt during this collision. (# 46, ex. A, Jes. Dep. 11/2/94 at 122) He then backed up the car and continued to travel down Route 28 south. (Id.) At this time, Pierce, who was driving the cruiser, was instructed by Sergeant Calvin Hall (hereinaf-

ter "Hall") via the radio to discontinue the pursuit[5]. (# 35, ex. 2, Pierce's Deposition at 99, "Pierce Dep. at __") As Jesionowski continued to travel down Broadway, he went through two sets of red lights and proceeded to the intersection of South Broadway and Salem Street in Lawrence, Massachusetts, where he collided with Steven Vayanos' (hereinafter "Vayanos") car which was stopped at a red light. (# 46, ex. A, Jes. Dep. 11/2/94 at 126 and Jes. Dep. 11/15/94 at 7) The front end of the driver's side of Jesionowski's car struck Vayanos' car in the rear on the passenger side[6]. (# 46, ex. A, Jes. Dep. 11/2/94 at 126 and Jes. Dep. 11/15/94 at 7) The parties' renditions of events differ significantly at this point.

According to the plaintiff, after the collision, he was unable to exit the vehicle, although he tried. (# 46, ex. A, Jes. Dep. 11/15/94 at 15) Officers Pierce and Burke, meanwhile, approached Jesionowski's vehicle, pried the door open, grabbed Jesionowski from the car, and immediately threw him to the ground[7]. (# 46, ex. A, Jes. Dep. 11/15/94 at 15, 24–8) One officer had his knee on Jesionowski's back and one officer had his arm or knee on Jesionowski's head while handcuffing him. (Id. at 25). At the same time, the blond officer said "we chased you last week you mother f----- and you got away, we got you now," and kicked Jesionowski. (Id. at 31–2) Jesionowski alleges that the blond officer kicked him twice in quick succession, the first time in the bridge of his nose and second in his forehead. (Id. at 32) The kick to his forehead caused a laceration which began to bleed immediately. (Id. at

---

3. With the parties' consent, this case has been referred and reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C § 636(c).

4. The defendants allege that Jesionowski put his car in reverse and tried to hit the officers before he proceeded down Canal Street. However, Jesionowski denies ever putting his car in reverse.

5. According to Jesionowski's deposition, he recalled blue lights flashing behind his car after the point where the officers were instructed to stop the pursuit. (# 46, ex. A, Jes.Dep. 11/2/94 at 130–2)

6. Both Jesionowski and Vayanos testified that the windshield of the blue Taurus operated by Jesionowski was not broken in this collision. (# 46, ex. A, Jes.Dep. 11/15/94 at 9; ex. K, Vayanos' Deposition at 133)

7. At his deposition, Jesionowski was able to identify the officers involved by face and description, but was confused as to their names. (# 46, ex. A, Jes.Dep. 11/15/94 at 26–8) Similarly, the plaintiff was not certain which officer did what to him when they grabbed him from the car and threw him to the ground. (Id. at 28–31) Moreover, Jesionowski testified that he believed that there was a total of five to seven police officers involved. (Id. at 32–3)

35, 38) Jesionowski was handcuffed and brought to his feet between 30 and 60 seconds after he was thrown to the ground. (# 46, ex. A, Jes. Dep. 11/15/94 at 38) The plaintiff was then taken to a police cruiser and placed in the back seat. (*Id.* at 41) He waited in the cruiser for between 10 and 30 minutes before he was escorted to an ambulance by an officer. (*Id.* at 42)

While Jesionowski was waiting in the cruiser, he observed the police officers huddled in a circle approximately 15 feet from him. (*Id.*) On two separate occasions, an officer came over to the cruiser with a flashlight to look at Jesionowski. (*Id.* at 42–3) At around the same time another cruiser arrived and an officer with gold bars on his coat, a gold hat, and a gold badge stepped out and went to the circle of police officers. (*Id.* at 43) This officer then came over to look at Jesionowski, went back to the other officers, and, shortly thereafter, an officer with a moustache came and took Jesionowski to the ambulance[8]. (*Id.*) As the officer escorted the plaintiff to the back of the ambulance, he said to Jesionowski, "nobody's going to believe a f------ junkie like you," and placed him in the ambulance. (*Id.*)

While in the ambulance, Jesionowski remained handcuffed with his hands behind his back and was also secured to the gurney with another pair of handcuffs. (*Id.* at 48–9) The plaintiff was transported to Lawrence General Hospital in about five minutes accompanied by the officer with a moustache and crooked teeth[9]. (# 46, ex. A, Jes. Dep. 11/15/94 at 51–2) After being taken from the ambulance, Jesionowski waited in the emergency room hallway for about five to ten minutes until a nurse approached him. (*Id.* at 56) The officer who had accompanied the plaintiff to the hospital went up to the nurse before she attended to Jesionowski and told her to put in the record that there were cuts and bruises on Jesionowski's chest and glass fragments in his hair because he had injured his head on the windshield. (*Id.* at 56–7, 59)

Jesionowski was then wheeled into a private room while the officer who had accompanied him in the ambulance stayed outside by the doorway. (*Id.* at 61–2) Another police officer[10] came to the door and Jesionowski overheard that officer say, "[the windshield] is being taken care of right now." (*Id.* at 66) That same officer left, but returned approximately fifteen minutes later and told the officer who had stayed in the hospital, "the windshield was all taken care of." (*Id.* at 67–71) At this point a doctor[11] came in and began to examine Jesionowski. (*Id.* at 71–2)

According to Jesionowski, the doctor told him that he had no injuries to the chest and agreed that there were no glass fragments. (# 46, ex. A, Jes. Dep. 11/15/94 at 72) Furthermore, the doctor said that the shape of the cut on Jesionowski's forehead was not consistent with an "automobile cut[12]." (*Id.*) The doctor then stitched up Jesionowski's wound. (*Id.* at 73) After the treatment, the plaintiff was taken from the hospital at about 1:30 a.m. to the Lawrence Police Department to be booked by the same police officer who had escorted him from the accident scene. (*Id.* at 74)

As noted, the defendants' versions of the facts vary from that of the plaintiff. According to the defendants, as Pierce approached

---

8. The plaintiff received no first aid care for his injury while waiting in the cruiser. According to Jesionowski, blood was spurting from the laceration on his forehead in such amounts that he was able to cover the front seat of the cruiser with his own blood. (# 46, ex. A, Jes.Dep. 11/15/94 at 42)

9. Jesionowski stated in his deposition that if he had to testify under oath, he would say that the officer who accompanied him in the ambulance was either Pierce or Burke, but he is not sure which one exactly. (# 46, ex. A, Jes.Dep. 11/15/94 at 52)

10. While Jesionowski believed this officer to be Officer Beck from the partial view he had from his gurney in the private room, the plaintiff admitted at his deposition that he was not sure that it was Officer Beck, and, further, although he knew the person was a police officer, he was not certain that the person was a Lawrence police officer. (# 46, ex. A, Jes.Dep. 11/15/94 at 64–5)

11. Jesionowski does not remember the doctor's name, but identified him as an Indian male. (# 46, ex. A, Jes.Dep. 11/15/94 at 71)

12. The doctor said an "automobile cut" would be jagged and straight across, unlike the half circle cut on Jesionowski's forehead. (# 46, ex. A, Jes. Dep. 11/15/94 at 72)

the Taurus after the collision with Vayanos' vehicle, he observed Jesionowski to be leaning over the steering wheel. (# 46, ex. C, Pierce Deposition at 119 "Pierce Dep. at ___") Pierce also noticed that there was a "spiderweb [13]" type of break on the windshield directly in front of the driver's seat. (*Id.* at 125) As Pierce reached the side of the car, Jesionowski sat up and looked at him. (*Id.* at 120) Pierce saw that there was blood all over the plaintiff's forehead. (*Id.* at 121)

During this period, Burke was on the passenger side of the vehicle, opposite from Pierce. (*Id.* at 122) Pierce grabbed Jesionowski by his left shoulder and arm and pulled him out of the Taurus. (# 46, ex. C, Pierce Dep. at 126–7) As soon as the plaintiff exited the car, he went down on the ground while Pierce was still holding on to his shoulder. (*Id.* at 129) Pierce then took out his handcuffs, straddled over Jesionowski with his knee next to the plaintiff, and began to handcuff him. (*Id.*) At the same time, Burke came over from the other side of the car to assist Pierce in handcuffing Jesionowski. (*Id.* at 130) Burke assumed a kneeling position similar to that of Pierce on the right side of the plaintiff. (*Id.* at 130–1) Throughout this process Jesionowski offered no active resistance to the arrest. (*Id.* at 129–30, 134)

Pierce and Burke then brought Jesionowski over to the passenger side of the cruiser for him to lean against the vehicle and wait for the ambulance to come.[14] (*Id.* at 137–9) The ambulance arrived within three to seven minutes, and the plaintiff was transported to Lawrence General Hospital. (*Id.* at 136, 144) Burke accompanied Jesionowski in the ambulance to the hospital (# 46, ex. F, Burke Deposition at 76–7, "Burke Dep. at ___") and Pierce followed the ambulance in the cruiser. (# 46, ex. C, Pierce Dep. at 148–9)

Shortly after they arrived at the hospital, Sergeant Hall stopped by to ask Pierce what charges would be pressed against Jesionowski. (# 46, ex. C, Pierce Dep. at 142–3) During the conversation, Burke joined them and advised that Jesionowski was alleging that the police had beaten him; upon hearing this, Pierce suggested that they take pictures of the car to counter the allegations. (*Id.* at 143–4) Pierce then left the hospital and went to Tower Hill Towing where the blue Ford Taurus had been towed. (*Id.* at 160) Steven Rutherford, a tow truck attendant at Tower Hill Towing, was present when pictures were taken of the blue Ford Taurus at the tow lot by Pierce to use as evidence against the allegations made by Jesionowski. (*Id.* at 160–2) [15]

Meanwhile, Burke stayed at the hospital with the plaintiff and was stationed immediately outside the door of the treatment room in order to guard him. (# 46, ex. F, Burke Dep. at 82–3) After Jesionowski received medical attention, he was transported to the police station by Burke and Pierce for booking. (*Id.* at 94)

### III. SUMMARY JUDGMENT STANDARD

■ The summary judgment standard in this Circuit is familiar. When considering the propriety of the entry of summary judgment, the Court must determine whether:

> ... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is a genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c).

In making this assessment, the Court is to examine the materials presented "in the light most favorable to the nonmoving party and

---

13. The spiderweb break was described by Pierce in his deposition as cracks that resembles the pattern of a spiderweb.

14. Officer Burke testified that after being handcuffed, Jesionowski was placed in the back seat of the police cruiser with the door shut to await the arrival of the ambulance. (# 46, ex. F, Burke Dep. at 70–1) When asked if the plaintiff had been seated in any police vehicle prior to being transported to the hospital, Pierce responded "Not that I recall." (# 46, ex. C, Pierce Dep. at 145)

15. It is unclear whether Pierce returned to the hospital after leaving the tow yard, but Burke testified that Pierce transported Jesionowski back to the station with him. (# 46, ex. F, Burke Dep. at 94)

indulge in all inferences in that party's favor." *Moody v. Boston and Maine Corporation*, 921 F.2d 1, 5 (1 Cir., 1990) (citation omitted); *Casas Office Machines, Inc. v. Mita Copystar America, Inc.*, 42 F.3d 668, 684 (1 Cir., 1994).

 A factual dispute which is neither "genuine" nor "material" will not survive a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In deciding whether a factual dispute is "genuine" the Court must determine whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*, see also *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1 Cir., 1995); *Vasapolli v. Rostoff*, 39 F.3d 27, 32 (1 Cir., 1994). In weighing whether a factual dispute is "material" the Court must examine the substantive law of the case, for "only disputes over the facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *National Amusements*, 43 F.3d at 735; *Vasapolli*, 39 F.3d at 32.

Rule 56 does not permit the party opposed to the summary judgment motion to rest upon the mere allegations or denials in its own pleadings. Rather, as stated by the Supreme Court:

> The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); see also *National Amusements*, 43 F.3d at 735.

Moreover,

> [e]ven in cases where elusive concepts such as motive and intent are at issue, summary

judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.

*Rivera–Cotto v. Rivera*, 38 F.3d 611, 613 (1 Cir., 1994) *quoting*, *Medina–Munoz v. R.J. Reynolds Tobacco Company*, 896 F.2d 5, 8 (1 Cir., 1990); see also *Mesnick v. General Electric Company*, 950 F.2d 816, 822 (1 Cir., 1991).

## IV.  DISCUSSION

### A.  Deliberate Indifference of Serious Medical Needs

The plaintiff claims that the defendants exhibited deliberate indifference to his serious medical needs and, in so doing, deprived him of his constitutional rights under the Fourteenth Amendment, thereby violating 42 U.S.C. § 1983 [16]. The Supreme Court has determined that the breadth of the constitutional rights and protections enjoyed by pretrial detainees is at least as great as that extended to convicted prisoners. *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1876–77, 60 L.Ed.2d 447 (1979); see also *Johnson v. Summers*, 411 Mass. 82, 86, 577 N.E.2d 301, 304 (1991) ("the constitutional rights of pretrial detainees are at least as broad as those afforded convicted prisoners.") For the present case, this means that at a minimum Jesionowski's Fourteenth Amendment right to medical care was comparable to the equivalent right that would be afforded a convicted prisoner under the Eighth Amendment. *See*, e.g., *Gerakaris v. Champagne*, 913 F.Supp. 646, 652 (D.Mass., 1996) (citations omitted) ("A detainee's Fourteenth Amendment due process right to adequate medical care is at least as great as the corresponding right of an inmate under the Eighth Amendment.") In this latter regard, the Supreme Court has reiterated that "deliberate indifference to serious medical needs of prisoners" violates the Cruel and Unusual Punishments Clause. *Farmer v. Brennan*, 511 U.S. 825, ——–——, 114 S.Ct. 1970,

---

**16.** The individual defendant police officers admit that at all pertinent times they were acting under color of state law. (# 35, Memorandum of Defendants at 1, n. 1) Consequently, Jesionowski need only prove a deprivation of a constitutional right or a right guaranteed under the laws of the United States in order to establish a violation of 42 U.S.C. § 1983. See, e.g., *Gerakaris v. Champagne*, 913 F.Supp. 646, 651 (D.Mass.,1996).

1976–8, 128 L.Ed.2d 811 (1994). Thus, concomitantly, in order to prove his Fourteenth Amendment claim, Jesionowski must establish that the defendants were deliberately indifferent to his serious medical needs.

Interpreting the *Farmer* decision, the First Circuit has written that "[i]n order to be found 'deliberately indifferent,' prison officials must be shown to have been subjectively aware of a condition requiring their intervention." *Mahan v. Plymouth County House of Corrections*, 64 F.3d 14, 18 (1 Cir., 1995) (citing *Farmer*, 511 U.S. at ——–——, 114 S.Ct. at 1980–82). Put another way, "*Farmer* ... equates 'deliberate indifference' with 'criminal recklessness,' the state of mind that arises 'when a person disregards a risk of harm of which he is aware.'" *Dias v. Vose*, 865 F.Supp. 53, 57 (D.Mass., 1994), *aff'd*, 50 F.3d 1 (1 Cir., 1995) (quoting *Farmer*, 511 U.S. at ——–——, 114 S.Ct. at 1978–1979). With the issue arising as it does in the context of this dispositive motion, it must be recognized that

> Because the element of 'deliberate indifference' requires a subjective inquiry, courts are cautious in granting summary judgment. However, where no reasonable view of the alleged facts permits an inference of culpable intent on a defendant's part, summary judgment is warranted.

*Dias*, 865 F.Supp. at 57.

■ A "serious medical need" has been defined through case law as "one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 208 (1 Cir., 1990), cert. denied, 500 U.S. 956, 111 S.Ct. 2266, 114 L.Ed.2d 718 (1991) (citing *Monmouth County Correctional Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3 Cir., 1987)); Accord *Mahan*, 64 F.3d at 18. The "seriousness" of a need may also be determined by reference to the effect of the delay of treatment. *Gaudreault*, 923 F.2d at 208 (citing *Monmouth County*, 834 F.2d at 347).

■ Taking the facts in the light most favorable to the non-moving party, Jesionowski's injury, the laceration on his forehead, was obvious given the amount of blood loss. According to the plaintiff, blood was spurting out of the cut on his forehead in such amounts that he was able to cover the front seat of a police cruiser with his blood. Jesionowski claims that he waited for about 30 minutes, while bleeding profusely, before he received any medical attention. Hospital records reflect that when the plaintiff was first observed by one nurse at 11:30 p.m. approximately one hour after his arrival[17], he was "in no acute distress; awake/alert oriented; exam by Dr. Gervasio; to x-ray; wound sutured by Dr. Gervasio ..." (# 46, ex. G) The impressions of his cervical spine and skull x-rays were "possible upper thoracic muscle spasm with no cervical injury detected" and "normal skull". (*Id.*) Jesionowski was given "tylenol 1000 mg. po plus 3 doses to home" at 1:35 a.m., and discharged from the hospital shortly thereafter. (*Id.*)

Findings of deliberate indifference to serious medical needs have been made where the delay in treatment has been significantly more than 30 minutes. In *Mahan*, the corrections officer where Mahan was held refused his request for Tegretol (a prescribed medication for treating depression and seizures caused by a head injury) for a period of eight days. *Mahan*, 64 F.3d at 15. In another case, the plaintiff's pelvis was fractured in three different places during an arrest. *Consolo v. George*, 58 F.3d 791 (1 Cir., 1995). The police officers did not provide medical treatment for the plaintiff until after he was booked, although the plaintiff was apparently in excruciating pain and unable to stand up. *Consolo*, 58 F.3d at 794. The jury in that case found for the plaintiff with respect to the claim of deliberate indifference to serious medical needs. *Id.* at 792. On the other hand, in *Gaudreault*, summary judgment was entered against the plaintiff who contended

---

**17.** In the triage assessment, the arrival time at the hospital was noted to be 10:30 p.m., with the plaintiff's condition evaluated to be "urgent", as opposed to "emergency" or "non urgent". It was further noted that Jesionowski had been involved in a motor vehicle accident and had a "1¼" lac. over R eye". (# 46, ex. G)

that he "was refused medical attention for a period of some ten hours after his arrest." *Gaudreault,* 923 F.2d at 208. Medical notes prepared on the day following his arrest reflected:

> ... bruises and abrasions ... and indicate that the hospital gave Gaudreault a sling for his left arm and a patch for his injured eye, and cleaned the abrasion on his back. The Radiology Report says that x-rays were taken of Gaudreault's facial and nasal bones, his cervical spine, left shoulder and left ribs. All were found "normal".

*Gaudreault,* 923 F.2d at 208.

In the words of the First Circuit, on the morning after his arrest Gaudreault was "bruised but unbroken, requiring no more medical care than a sling, an eye-patch and the application of some disinfectant." *Id.*

In the instant case, the delay of treatment was not nearly as long as the eight days in *Mahan* or the hours in *Consolo* and *Gaudreault,* nor was the plaintiff's injury nearly as egregious. Even accepting the facts most favorably to the plaintiff, there quite simply is no evidence in this case which supports the notion that Jesionowski's injury was "serious", or that the defendants' conduct in failing to secure medical attention for him in under 30 minutes could be viewed as rising to the level of "criminal recklessness". As in *Gaudreault,* while the plaintiff's injury "may have been 'obvious' in the sense that his bruises and abrasions were visible, the medical record demonstrates that he did not display any *needs* so patent as to make lay persons ... remiss in failing to arrange immediate medical care." *Gaudreault,* 923 F.2d at 208 (emphasis in original). There is a dearth of evidence to show that Jesionowski's condition was exacerbated in any manner by the delay, or that the delay of treatment caused any permanent damage to him, or that his end medical result was at all implicated by the actions of the defendant police officers. At worst, he may have lost more blood than he would have had treatment been provided more promptly, but again, there is nothing to show what, if any, effect this may have had on him.

In these circumstances, as a matter of law no finding of deliberate indifference to seri-

ous medical needs on the part of the police officers involved in Jesionowski's case is possible. It follows, therefore, that the defendants are entitled to the entry of judgment as a matter of law in that there can be no finding of due process violations under the Fourteenth Amendment with respect to the delay in medical treatment.

## B. Use of Excessive Force During an Arrest

According to the Supreme Court, an excessive force claim brought under § 1983 "is not governed by a single generic standard." *Graham v. Connor,* 490 U.S. 386, 393, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989). Rather, when analyzing such a claim, it is incumbent upon the court "to isolate the precise constitutional violation ..." and apply "the specific constitutional standard which governs that right." *Graham,* 490 U.S. at 394, 109 S.Ct. at 1871. In the instant case, the plaintiff alleges a violation of his Fourth Amendment right to be secure from unreasonable seizures and, therefore, the Fourth Amendment and its "reasonableness" standard governs. *Id.* at 395, 109 S.Ct. at 1871.

The law is clear that "to determine the constitutionality of a seizure '[the court] must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985), quoting, *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983). Applying this principle to the use of force to effect an arrest, "a police officer may use only such force as is reasonably necessary to effect an arrest or to defend himself or others from bodily harm." *United States v. McQueeney,* 674 F.2d 109, 113 (1 Cir., 1982), citing, *United States v. Stokes,* 506 F.2d 771, 776 (5 Cir., 1975). The "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene." *Graham,* 490 U.S. at 396, 109 S.Ct. at 1872; see, *Terry v. Ohio,* 392 U.S. 1, 20–22, 88 S.Ct. 1868, 1879–81, 20 L.Ed.2d 889 (1968); *Roy v. In-*

*habitants of City of Lewiston,* 42 F.3d 691, 694 (1 Cir., 1994). When considering whether a particular use of force was reasonable, the court looks at factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396, 109 S.Ct. at 1872; see, *Dean v. City of Worcester,* 924 F.2d 364, 369 (1 Cir., 1991). As summarized by the First Circuit:

> In the Fourth Amendment setting, a viable excessive force claim must demonstrate that the police defendant's actions were not objectively reasonable, viewed in light of the facts and circumstances confronting him and without regard to his underlying intent or motivation.

*Alexis v. McDonald's Restaurants of Massachusetts, Inc.,* 67 F.3d 341, 352 (1 Cir., 1995) (citation omitted).

█ In the instant case, according to the plaintiff, he was being held on the ground with his arms behind him to be handcuffed by at least two police officers at the time he was allegedly kicked in the head. It is undisputed that Jesionowski offered no active resistance to the arrest. While the defendants may argue that the plaintiff had posed a danger from the way he was driving, Jesionowski testified that at the time of the arrest his car had come to a complete stop due to the accident and he was unable to exit the car due to the collision. Even judging from the perspective of a reasonable police officer at the scene, there is no evidence to indicate that at the time of his arrest Jesionowski was a threat of danger to the officers effecting the arrest nor to others at the scene. Consequently, to the extent that the jury credited the plaintiff's account, there would be no need for the police to apply such force as has been alleged so as to effectuate Jesionowski's arrest, and a constitutional violation could be established.

At present, it is unclear which of two officers, Burke or Pierce, allegedly kicked the plaintiff. As earlier noted, Jesionowski testified at his deposition that it was definitely one of the two, and that he could recognize and identify the officer from his physical appearance and characteristics, but became confused with respect to their names. In his statement and at his deposition, Vayanos, too, identified the police officers by their physical descriptions. Withal, no evidence has been submitted that in any manner suggests that Beck himself used force, excessive or otherwise, against the plaintiff. With this state of the record, a genuine issue of material fact exists with respect to the identity of the officer who purportedly used excessive force when arresting Jesionowski [18], but that officer was either Burke or Pierce, not Beck.

█ This conclusion alone, however, does not end the inquiry with respect to Beck's involvement or liability; it must be considered whether he had a duty to intervene and stop the excessive use of force. "[C]ourts have held that a police officer who fails to prevent the use in his presence of excessive force by another officer may be held liable under § 1983." *Noel v. Town of Plymouth, Mass.,* 895 F.Supp. 346, 352 (D.Mass., 1995), quoting, *Hathaway v. Stone,* 687 F.Supp. 708, 712 (D.Mass., 1988); *Gaudreault,* 923 F.2d. at 207, n. 3. By the same token, "an onlooker cannot be charged with section 1983 liability for another's sudden, momentary actions." *Noel,* 895 F.Supp. at 352 (citations omitted).

In *Noel,* it was determined that "the plaintiff's purported injuries are most consistent with a scuffle of quick duration, involving a blow to the face followed by a blow to the back." *Id.* at 352–3. Given these circumstances, the court concluded that four of the defendant officers "had no realistic opportunity to intervene, and cannot be held liable for failing to do so." *Noel,* 895 F.Supp. at

---

**18.** The Supreme Court has noted that the officer's objective 'good faith'—that is, whether he could reasonably have believed that the force used did not violate the Fourth Amendment—may be relevant to the availability of the qualified immunity defense to monetary liability under § 1983.

*Graham,* 490 U.S. at 399, n. 12, 109 S.Ct. at 1873, n. 12.
The defendants have not raised or briefed any claims of qualified immunity in the instant motion.

353. The *Noel* situation is quite comparable to that in the present case. According to Jesionowski, the two kicks to his head occurred one right after the other in quick succession. It follows that, even if Beck did observe the use of excessive force during Jesionowski's arrest, he had no realistic opportunity to intervene. Thus, Beck cannot be held liable under the § 1983 claim.

## C. The State Law Claim of Assault and Battery

The plaintiff has also asserted a state law claim of assault and battery against Burke and Pierce, and a claim for aiding and abetting against Beck for his purported failure to stop the assault and battery. Under that law of Massachusetts, assault and battery is defined as "the intentional and unjustified use of force upon the person of another, however slight, or the intentional doing of a wanton or grossly negligent act causing personal injury to another." *Commonwealth v. McCan,* 277 Mass. 199, 203, 178 N.E. 633, 634 (1932) (citations omitted). Although a police officer has "the right to use the force which is reasonably necessary to overcome physical resistance by the person sought to be arrested," *Julian v. Randazzo,* 380 Mass. 391, 396, 403 N.E.2d 931, 934 (1980) (citations omitted), taking the facts in the light most favorable to Jesionowski, the force used in his arrest would not be considered "reasonable".

In a case wherein similar claims were alleged, the First Circuit had occasion to write that

the identical reasoning which constrained our determination that the officers' use of force was objectively reasonable in fourth amendment terms, under *Graham v. Connor,* controls the "reasonableness" determination required on [the plaintiff's] common law claims for assault and battery.

*Dean,* 924 F.2d at 369.

Thus, in other words, the plaintiff's assault and battery claims will rise or fall in the same manner as his Fourth Amendment claims: genuine issues of material fact are extant with respect to the claims against Burke and Pierce, while Beck is entitled to the entry of judgment in his favor as a matter of law.

## D. Conspiracy

The plaintiff claims that Burke, Pierce, and Beck engaged in a civil rights conspiracy against him, to wit:

"a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damages.'"

*Santiago v. Fenton,* 891 F.2d 373, 389 (1 Cir.,1989), quoting, *Hampton v. Hanrahan,* 600 F.2d 600, 620–21 (7 Cir.,1979).

The First Circuit

has ruled that for a conspiracy to be actionable under section 1983 the plaintiff has to prove that "there [has] been, besides the agreement, an actual deprivation of a right secured by the Constitution and laws."

*Earle v. Benoit,* 850 F.2d 836, 845 (1 Cir.,1988), quoting, *Landrigan v. City of Warwick,* 628 F.2d 736, 742 (1 Cir.,1980). Finally, sufficient circumstantial evidence of such a conspiracy among the officers to violate Jesionowski's constitutional rights will carry the day, it being unnecessary to prove an express agreement. *Earle,* 850 F.2d at 845.

In the present case, there is sufficient evidence to raise a genuine issue of material fact for a jury to decide whether Burke and Pierce engaged in a conspiracy. During the arrest, Jesionowski alleges that he was held to the ground by two or more officers while the another officer kicked him in the head. The only two officers that the plaintiff has identified, or has indicated an ability to identify, are Burke and Pierce. Under Jesionowski's version of events, it could be inferred that the officers were acting in concert in applying excessive force during his arrest.

Thereafter, there is evidence presented from which it could be inferred that the officers were acting together to conceal the

fact that Jesionowski's injury was inflicted by one of the two of them. The plaintiff testified that at the hospital he overheard the officer who had accompanied him in the ambulance (either Burke or Pierce) asking the nurse to put in Jesionowski's medical records that there were glass fragments found in his clothing and that he had injured his forehead on the windshield of his car during the collision. Furthermore, Jesionowski also heard an unknown police officer mention to the officer who had accompanied him in the ambulance that someone was taking care of, and then had taken care of the windshield.

Although Vayanos and the plaintiff testified that Jesionowski's windshield was not broken at the time of the collision, the police officers contend that the windshield was broken in the accident. Pierce admittedly went to the tow lot to take pictures of the vehicle after the accident, but there is evidence to suggest that he was accompanied by one of the tow lot operators. According to the plaintiff, the physician who treated him at the hospital stated that there were no glass fragments on the plaintiff's person, and that the cut on Jesionowski's forehead was not consistent with an "automobile cut".

In all these circumstances, viewing the facts presented by the plaintiff in a most favorable light, there is sufficient circumstantial evidence to raise a genuine issue of material fact as to whether Burke and Pierce conspired to deprive the plaintiff of his civil rights. Once again, Beck's circumstances must be examined independently.

There is no apparent dispute that Beck was at the scene of the accident. However, the plaintiff does not identify him as one of the officers who grabbed him, threw him to the ground and handcuffed him, and he specifically was not the officer who kicked allegedly Jesionowski while he was on the ground. As earlier indicated, at his deposition Jesionowski first identified Beck as the police officer who told the officer outside of his hospital door that the windshield was "being

taken care of right now", and, shortly thereafter, that the windshield "had been taken care of." At the same time, however, the plaintiff stated that he could not be sure that it was Officer Beck, and that he had learned the officer's name from his first attorney. Upon being questioned further, Jesionowski testified that although he knew that the person was a police officer, he could not even confirm that the person was a Lawrence police officer.[19]

This state of the evidence notwithstanding, however, at his deposition, Beck testified that the windshield of the plaintiff's vehicle was broken at the scene of the accident. (# 46, ex. D at 59) Even more specifically, Beck described the broken windshield as resembling "a spider cut above the steering wheel", which to him meant "when a windshield is struck by a head in an accident." (*Id.* at 106) In further explanation, Beck stated that a spider cut such as he observed on Jesionowski's windshield "it's like a small hole, but not broken through, and the cracks break out from it like a sunburst type." (# 46, ex. D at 106)

■ The factfinders will plainly be presented with directly contrary evidence regarding the state of the windshield of the plaintiff's car at the accident scene as well as the manner in which Jesionowski came to be injured. If the jury was to credit the testimony proffered by the plaintiff and Vayanos, i.e., that the windshield was not broken during the accident, there would be a basis for finding that Beck was lying. It follows that it could be determined that Beck was a participant in a conspiracy at least to the extent of conspiring to cover-up the true circumstances under which Jesionowski received his head injury, to wit, other than by striking his head on the windshield in the accident. Drawing all the reasonable inferences in favor of the plaintiff, a genuine issue of material fact exists as to whether Beck engaged in a cover-up and so conspired to deprive Jesionowski his constitutional rights.

19. Indeed, according to Beck's deposition testimony, approximately fifteen minutes after the accident between Jesionowski and Vayanos, Beck and his partner departed from the scene in their cruiser and resumed their routine patrol responding to other calls. *See*, # 46, ex. D at 80, 83, 120, 128. This testimony in no way aids the plaintiff in establishing that the police officer either at the hospital or at the tow lot was Beck.

## V.  CONCLUSION AND ORDER

For all of the reasons stated hereinabove, it is ORDERED that the Motion of Defendant, William J. Beck, For Summary Judgment (# 32) be, and the same hereby is, ALLOWED as to the claims alleged against Beck in Count I and Count IV; it is FURTHER ORDERED that said motion (# 32) be, and the same hereby is, otherwise DENIED.  It is FURTHER ORDERED that the Motion of Defendant, Denis J. Pierce, For Summary Judgment (# 33) and the Motion of Defendant, Thomas J. Burke, For Summary Judgment (# 34), be, and hereby are, ALLOWED to the extent that summary judgment will be entered on the claim of deliberate indifference to medical needs contained in Count I; it is FURTHER ORDERED that said motions (## 33 & 34) be, and the same hereby are, otherwise, DENIED.