Richard PARKER, Plaintiff,

v.

TOWN OF SWANSEA,
et al., Defendants.

No. CIV.A.01–10063–JGD.

United States District Court,
D. Massachusetts.

Jan. 28, 2004.

William P Breen, Jr., Murphy, Hesse, Toomey, and Lehane LLP, Quincy, MA, for Swansea, Town of, Mark Haslam, Richard Roussel, William O. McGrath, Defendants.

John J. Davis, Pierce, Davis & Perritano, LLP, Boston, MA, for Swansea, Town of, Mark Haslam, Richard Roussel, William O. McGrath, Defendants.

Douglas I. Louison, James W. Simpson, Jr., Merrick, Louison & Costello, Boston, MA, for Somerset, Town of, Jeffery Cote, Defendants.

Barry Ward, New London, CT, for Richard Parker, Plaintiff.

## *MEMORANDUM OF DECISION AND ORDER ON DEFENDANT RICHARD ROUSSEL'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW*[1]

DEIN, United States Magistrate Judge.

### I. *INTRODUCTION*

The plaintiff, Richard Parker ("Parker"), brought this action alleging that his federal constitutional and state law rights were violated on February 20, 1998 when he was shot a number of times by police following a car chase which resulted in his arrest. Parker alleged several claims against three individual Swansea police officers as well as against the Town of Swansea (the

1. The parties consented to transfer the case to this court for all purposes, including trial and the entry of final judgment, pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73.

"Town") itself.[2] However, all of his claims except for those brought pursuant to 42 U.S.C. § 1983 and the pendent assault and battery claims were either resolved at the summary judgment stage or withdrawn during the trial. A jury returned a verdict in favor of the Town and two of the police officers, William McGrath and Marc Haslam. Officer Richard Roussel ("Officer Roussel") was found liable for compensatory damages in the amount of $250,000; no punitive damages were awarded.

Presently before the court is Officer Roussel's "Renewed Motion for Judgment as a Matter of Law" (Docket #130) wherein he contends that he is entitled to qualified immunity on the § 1983 claim, and that judgment should be entered in his favor on the assault an battery count as well. For the reasons detailed herein, the motion is DENIED.

## II. STATEMENT OF FACTS[3]

The jury could have found that on the evening of February 19, 1998, Parker drove his jeep from his home in New London, Connecticut to attend a concert at a club in Providence, Rhode Island. He discovered that the club was closed, and was traveling home when he got lost in Massachusetts. At approximately 12:20 a.m., Swansea Police Officer William McGrath contends he observed Parker's jeep drifting between eastbound lanes and into a westbound lane on Route 6 in Swansea. During this "drifting," Parker allegedly crossed over the double yellow center line of the road, which is a motor vehicle violation in Massachusetts.

According to Officer McGrath, Parker's erratic driving raised his suspicions so he activated his lights and siren to signal Parker to pull over. Parker complied and pulled over briefly. Officer McGrath pulled his car alongside and slightly to the front of the driver's side of Parker's jeep. Parker contends that while he was waiting for Officer McGrath to approach his vehicle, a second Swansea police car driven by Swansea Police Officer Marc Haslam approached the scene traveling at a rapid speed and pulled in front of him. After Officer McGrath exited his cruiser to approach Parker's jeep, Parker got scared and drove away, fleeing on to Route I–195 eastbound.[4]

### The Motor Vehicle Pursuit

After Parker fled, Officers Haslam and McGrath followed him onto I–195. Officer Roussel joined the chase, as did Somerset Police Officer Jeffrey Cote. While traveling approximately 65–75 mph, Officer Roussel's car was directly in front of Parker's jeep, Officer McGrath was on Parker's right, and Officer Haslam was directly behind Parker. This configuration is known as a "rolling road-block" or a "box-

2. Parker also originally named an individual officer from the Somerset Police Department and the Town of Somerset as defendants. However, the Town of Somerset prevailed on its motion for summary judgment on all counts alleged against it, and the Somerset defendants all settled with the plaintiff shortly before trial.

3. The following Statement of Facts is based on the evidence presented at trial and is limited to those facts relevant to the instant motion. Additionally, the facts are viewed in the light most favorable to Parker. *See, e.g.,* *Cruz–Vargas v. R.J. Reynolds Tobacco Co.,* 348 F.3d 271, 275 (1st Cir.2003) (when evaluating motion for judgment as a matter of law, court must read the evidence in the light most favorable to the jury verdict).

4. At trial, Officer McGrath testified that he had also pulled Parker over shortly before the traffic stop described herein, but that Parker fled the scene during that stop as well. Parker did not testify as to this first stop one way or the other. Ultimately, the number of times Parker was pulled over that morning is immaterial to the resolution of this motion.

in." The defendants testified that Parker attempted to ram their cruisers during this chase, which Parker denies.

The vehicles remained in this "box-in" formation until they arrived at the Braga Bridge, which is located near exit 10. At that point, a disabled vehicle in the roadway forced the cars into a singe file line. In addition, Fall River Police Officer Brian O'Hearn, who had received word of the chase, was at the bridge standing behind a vehicle with his gun drawn. Parker testified that he did not know that Officer O'Hearn wanted him to stop. After slowing down substantially, Parker managed to avoid the vehicle and proceed over the bridge.

Shortly thereafter, around exit 10 which accesses Route 88, Swansea's Sergeant Sadler who had been supervising the pursuit from the station and knew multiple cruisers were involved, was informed by the officers that the vehicles were traveling at approximately 75 mph. He ordered the officers to stop the chase because the offenses for which they were pursuing Parker were just motor vehicle offenses. At that point, all the officers complied and turned off their sirens and blue lights, while slowing down in preparation for taking exit 10. However, Parker suddenly cut across the highway and took exit 10 himself. As Parker was taking the exit, he lost control of his jeep and went off the road, hitting a tree and landing in a ditch.

### The Post–Pursuit Shooting

All four police cars also took exit 10 and stopped near the crash site. It is undisputed that Officer Roussel immediately approached Parker's jeep. Officer Roussel characterized his approach as "walking quickly" with his flashlight in one hand and his service firearm in the other. The parties disagree as to the subsequent events that transpired at the crash site.

Parker testified that shortly after crashing, he exited the jeep with his hands out in front of him and with his palms facing out because he was attempting to surrender. It is undisputed that Parker was wearing camouflage pants, a black cap, and black weight-lifting gloves with the fingertips cut off. A jury could have found that Officer Roussel did not give Parker time to surrender, but rather rushed up to within ten feet of Parker's jeep, and immediately started shooting. It is undisputed that Officer Roussel fired 14 shots at Parker, and then dove to his right and rolled to the right behind the rear of the jeep, dropping his flashlight. According to the defendants, the other officers believed that Officer Roussel had been shot, and they began firing at Parker as well. Roussel retreated to behind his vehicle and assumed a position of cover. He shot at Parker an additional 14 times.

All of the officers testified that they believed that Parker was armed. Although the area was searched, no gun was ever found, and Parker denies having been armed.

According to Parker, although he initially had his hands palms out in front of him when he got out of the jeep, he was soon shot in the finger and grabbed the injured finger tightly. Parker also grabbed other parts of his body as he was hit in those places with bullets. Despite the intense gunfire, Parker did not go down immediately, and the police continued to shoot until, eventually, Parker retreated and fell into a ditch.

Massachusetts State Police ballistics testing conclusively determined that the police officers fired a total of 49 shots at Parker. Between six and eight of these bullets struck him. These shots hit him in the foot, four places in his legs, his penis, and his abdomen. Although 28 of the

shots were attributed to Roussel, it is unknown how many of his shots, if any, struck Parker.

The critical difference between the defendants' version of events and Parker's is that the defendants testified that Parker pretended to be armed and acted accordingly. Thus, according to the defendants, as Roussel approached the jeep, he commanded Parker to stay in the vehicle and put his hands out the window. Parker briefly complied and put one hand out the window before quickly retracting it. According to the defendants, when Roussel was approximately ten feet away from the jeep, Parker abruptly exited the driver's side of the vehicle in a "combat crouch" shooting stance and turned towards the officers with his hands clasped together in front of him at waistband level, and started to advance towards Roussel. The defendants asserted that Parker then raised his hands to shoulder level in Roussel's direction while still clasped together, pretending to aim a gun at Roussel. The defendants testified that they repeatedly instructed Parker to "get down," "show us your hands," and "drop the gun," but that Parker did not comply, and so they continued firing at him. In short, according to the defendants, they reasonably believed (and continued to assert at trial) that Parker was armed, and that they were acting in self-defense. By its verdict, the jury apparently found Officers Haslam's and McGrath's conduct reasonable under the circumstances, but not Officer Roussel's.

It is undisputed that after being shot repeatedly Parker finally returned to the ditch area near his jeep and collapsed on the ground. No shots were fired at Parker while he was retreating. The defendant officers, accompanied by officers from other departments, converged on Parker and handcuffed him. Parker was then taken by ambulance, and then helicopter, to the hospital where he was listed in critical condition.

## III. DISCUSSION

### A. Standard of Review

Roussel has renewed his motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b). In ruling on such a motion, the court must "examine the record as a whole, reading the evidence in the light most favorable to the jury verdict." *Cruz–Vargas v. R.J. Reynolds Tobacco Co.,* 348 F.3d at 275. Accordingly, the court's review is "weighted toward preservation of the jury verdict." *Primus v. Galgano,* 329 F.3d 236, 241 (1st Cir.2003) (internal citation and quotations omitted). "When a qualified immunity defense is pressed after a jury verdict, the evidence must be construed in the light most hospitable to the party that prevailed at trial . . . and deference should be accorded the jury's discernible resolution of disputed factual issues." *Jarrett v. Town of Yarmouth,* 331 F.3d 140, 147 (1st Cir.), *cert. denied,* —— U.S. ——, 124 S.Ct. 573, 157 L.Ed.2d 431 (2003) (quoting *Iacobucci v. Boulter,* 193 F.3d 14, 23 (1st Cir.1999)). A Rule 50(b) motion should be allowed "only if the facts and inferences point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have reached a verdict against that party." *Santos v. Sunrise Med., Inc.,* 351 F.3d 587, 590 (1st Cir.2003) (quoting *Star Fin. Servs., Inc. v. Aastar Mortgage Corp.,* 89 F.3d 5, 8 (1st Cir.1996)) (additional citation omitted). Applying these principles to the instant case requires that Officer Roussel's motion be denied.

### B. 42 U.S.C. § 1983

Officer Roussel's primary argument in the instant motion, as it was at the summary judgment stage, is that he cannot be liable to Parker under § 1983 for using

excessive force during the arrest because he is entitled to qualified immunity. For the reasons that follow, this court disagrees.

■ Pursuant to 42 U.S.C. § 1983:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

"A claim under section 1983 has two essential elements. First, the challenged conduct must be attributable to a person acting under color of state law ...; second, the conduct must have worked a denial of rights secured by the Constitution or by federal law." *Soto v. Flores,* 103 F.3d 1056, 1061 (1st Cir.), *cert. denied,* 522 U.S. 819, 118 S.Ct. 71, 139 L.Ed.2d 32 (1997), and cases cited.

■ The doctrine of qualified immunity provides that, even where there has been a constitutional violation, " '[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Tower v. Leslie–Brown,* 326 F.3d 290, 296 (1st Cir.2003) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). "The availability of qualified immunity after a trial is a legal question informed by the jury's findings of

fact, but ultimately committed to the court's judgment." *Acevedo–Garcia v. Monroig,* 351 F.3d 547, 563 (1st Cir.2003).

■ Determining whether qualified immunity is available to a defendant in a given case requires the court to make a "trifurcated inquiry." [5] *Id.* The first question is whether "the plaintiff has alleged the violation of a constitutional right," if so, the court then asks "whether the contours of the right were sufficiently established at the time of the alleged violation," and, if so, the final question is "whether an objectively reasonable official would have believed that the action taken or omitted violated that right." *Id.* at 563–64 (quoting *Hatch v. Dept. for Children, Youth and Their Families,* 274 F.3d 12, 20 (1st Cir. 2001)). Applying these standards to the instant case compels the conclusion that Officer Roussel is not entitled to qualified immunity.

**1.** *The Alleged Violation of a Constitutional Right*

■ There was sufficient evidence for the jury to find that Officer Roussel violated Parker's Fourth Amendment right to be free from excessive force during his arrest. In evaluating "a Rule 50(b) motion after a jury verdict," the first prong of the immunity analysis focuses on "whether, taken in the light most favorable to the party asserting the injury, the evidence adduced at trial is sufficient to establish that [the officers] committed a constitutional violation[.]" *Figg v. Schroeder,* 312 F.3d 625, 635 (4th Cir.2002) (internal citations and quotations omitted) (alteration in original); *accord Jarrett v. Town of Yarmouth,* 331 F.3d at 146–47 (first step in

---

**5.** The qualified immunity standard has also been described as "a two-part test" because courts sometimes "merge the second and third prongs of the immunity analysis."

*Tremblay v. McClellan,* 350 F.3d 195, 199–200 (1st Cir.2003). Notwithstanding these different descriptions, courts ultimately consider the same factors.

qualified immunity inquiry after jury returned verdict for plaintiff was to consider whether the facts alleged show that the officer's conduct violated a constitutional right).

■ The parties agree that where, as here, an excessive force claim arises in the context of an arrest, it involves the protections of the Fourth Amendment which guarantees citizens the right "to be secure ... against unreasonable ... seizures" of their person. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). The dispositive question is whether the amount of force used was objectively reasonable under the circumstances. *See Jarrett v. Town of Yarmouth*, 331 F.3d at 150. The "Supreme Court's standard of reasonableness is comparatively generous to the police in cases where potential danger, emergency conditions or other exigent circumstances are present." *Roy v. Inhabitants of the City of Lewiston*, 42 F.3d 691, 695 (1st Cir. 1994).[6]

■ "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. at 396, 109 S.Ct. at 1871 (internal citation and quotation omitted). It is a "fact-intensive inquiry that is highly sensitive to the circumstances of the particular case[.]" *Jarrett v. Town of Yarmouth*, 331 F.3d at 148. The officer's conduct "must be judged

from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. at 396, 109 S.Ct. at 1872. Relevant factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Jarrett v. Town of Yarmouth*, 331 F.3d at 148 (quoting *Graham v. Connor*, 490 U.S. at 396, 109 S.Ct. at 1872). Moreover, in the Fourth Amendment context, "under clearly established law," the use of deadly force "is constitutional only if, at a minimum, a suspect poses an immediate threat to police officers or civilians." *Jarrett v. Town of Yarmouth*, 331 F.3d at 149 (citing *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985)). In light of the evidence presented at trial, there was a reasonable basis for the jury to find that Officer Roussel deprived Parker of his Fourth Amendment rights.

Based on its verdict, the jury may have concluded that Officer Roussel acted unreasonably in failing to take time to assess the situation or to give Parker time to surrender before rushing towards the jeep with his gun drawn and opening fire. The jury also may have credited Parker's testimony that he emerged from the jeep with his hands extended in front of him so that he could surrender to the officers, and that he did not clasp his hands together until after he was shot in the hand. The jury could have concluded that no objectively

---

**6.** Although *Roy* and some of the other cases cited in this court's analysis of the first prong of the qualified immunity standard evaluated the officers' conduct in connection with "objective reasonableness" as it relates to the third prong of the analysis, "[b]ecause objective reasonableness is the touchstone of the excessive force inquiry, the constitutional and

qualified immunity inquiries in this area are closely intertwined," and, thus, case law addressing excessive force claims "may be instructive even if these claims were ultimately resolved on qualified immunity grounds" as opposed to on the merits of the constitutional question itself. *Jarrett v. Town of Yarmouth*, 331 F.3d at 148.

reasonable police officer could have deemed that Parker posed a threat warranting the use of deadly force at the time Officer Roussel started shooting.

Additionally, assuming, *arguendo,* Roussel acted reasonably in firing the initial shots at Parker, the jury could have found that he was not justified in continuing to shoot. *Cf. Napier v. Town of Windham,* 187 F.3d 177, 185–87 (1st Cir.1999) (analyzing each series of shots separately). The testimony from all officers was that the shooting continued uninterrupted until Parker finally fell down. Thus, the jury could reasonably have concluded that Officer Roussel did not reassess whether, and to what extent, Parker constituted a threat while he continued to shoot. Under such circumstances, the evidence at trial was sufficient to establish that Officer Roussel committed a constitutional violation and, thus, the first prong of the immunity analysis has been met.

 Officer Roussel also asserts that he cannot be held liable under § 1983 because he did not intend for the force he used to be "excessive." This argument fails, however, because the proper inquiry under the Fourth Amendment is not "whether the police officer intended to brutalize a suspect or merely intended to discipline him," rather, the question is "whether the officer intended to perform the underlying violent act at all." *Glasco v. Ballard,* 768 F.Supp. 176, 179 (E.D.Va. 1991) (accidental discharge of gun does not support a § 1983 claim); *accord Landol–Rivera v. Cruz Cosme,* 906 F.2d 791, 796 n. 9 (1st Cir.1990) (where police conduct is intentional, Fourth Amendment is triggered when police officer accidentally

causes more severe harm than intended). There is no dispute here that Officer Roussel intended to fire his gun at Parker 28 times. The shooting was not the result of any "mistake" or "negligence." Therefore, the jury reasonably found that Officer Roussel violated Parker's Fourth Amendment rights. Having answered the first prong of the qualified immunity inquiry in the affirmative, the next inquiry is whether the right was "clearly established" at the time of the shooting.[7] This court concludes that it was.

### 2. *The Right At Issue Was Clearly Established*

 "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition[.]" *Id.* at 201, 121 S.Ct. at 2156. The standards for the appropriate use of deadly force have been well established for more than ten years—since at least the U.S. Supreme Court decision in *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985) ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."). *See also Clem v. Corbeau,* 284 F.3d 543, 554 (4th Cir.2002) (where plaintiff offered evidence that he was "nondangerous" and that the officer's firing of multiple shots at

---

7. Officer Roussel also attempts to shift the focus of the "intent" analysis by arguing that his actions in approaching the jeep cannot form the basis of liability since, at most, the approach was negligent. However, the § 1983 claim is not based on Officer Roussel's actions in approaching the jeep but on his firing at Parker 28 times after Parker exited the jeep.

close range could have killed him, *Tennessee v. Garner*, decided in 1985, "clearly established" the unconstitutionality of the police shooting). As detailed above, there was evidence to support the conclusion that it should have been apparent to Officer Roussel that Parker was not dangerous. Thus, at the time Officer Roussel shot Parker, it was clearly established that using deadly force under circumstances such as these amounted to the unlawful use of excessive force. Therefore, the second prong is satisfied as well and the court will now consider the third, and final, prong of the qualified immunity analysis.

### 3. *Officer Roussel's Belief Was Objectively Unreasonable*

 "Because objective reasonableness is the touchstone of the excessive force inquiry, the constitutional and qualified immunity inquiries in this area are closely intertwined." *Jarrett v. Town of Yarmouth*, 331 F.3d at 148. Nonetheless, these prongs "remain distinct." *Saucier v. Katz*, 533 U.S. at 204, 121 S.Ct. at 2158.[8] This is because the qualified immunity inquiry "has a further dimension," namely the concern that even when the officer accurately perceives the facts of the situation, "reasonable mistakes can be made as to the legal constraints on particular police conduct." *Id.* at 205, 121 S.Ct. at 2158. At this stage of the analysis, "[t]he question is what the officer reasonably understood his powers and responsibilities to be, when he acted, under clearly established standards." *Id.* at 208, 121 S.Ct. at 2159.

Based on the evidence presented at trial, viewed most favorably to Parker, no police officer could have reasonably believed that the law allowed him to shoot at Parker 28 times under the circumstances. Again, the testimony was to the effect that Parker had his hands out in front of him and was trying to surrender, and that Officer Roussel over-reacted, as well as failed to reassess the situation while continuously shooting. This is not a situation where qualified immunity is needed to protect Officer Roussel "from the sometimes hazy border between excessive and acceptable force[.]" *Id.* at 206, 121 S.Ct. at 2158.

For all these reasons, Officer Roussel is not entitled to qualified immunity and his motion for judgment as a matter of law on Parker's claim brought under 42 U.S.C. § 1983 is denied.

### C. *Assault and Battery*

 Officer Roussel has also moved for judgment as a matter of law on Parker's pendant state law assault and battery claim. Officer Roussel contends that, as a police officer effectuating an arrest, he was entitled to use the amount of force reasonably necessary to subdue Parker. He also argues that he is not liable because he acted in self defense. However, as detailed above, the evidence presented at trial supports the conclusion that Officer Roussel exceeded the amount of force he was permitted to use.

---

**8.** It has been noted that qualified immunity "is a difficult concept" that "inherently makes for confusion" since "it looks to the reasonableness of an officer's belief that he acted lawfully after the officer is found to have been unreasonable in his conduct." *Stephenson v. Doe*, 332 F.3d 68, 80 n. 15 (2d Cir.2003), and cases cited; *accord Saucier v. Katz*, 533 U.S. at 210, 121 S.Ct. at 2160–61 (Ginsberg, J. concurring) (multi-part inquiry in excessive force/qualified immunity cases "holds large potential to confuse" as "the determination of police misconduct in excessive force cases and the availability of qualified immunity both hinge on the same question: Taking into account the particular circumstances confronting the defendant officer, could a reasonable officer, identically situated, have believed the force employed was lawful?").

■■■■■ Assault and battery is the " 'intentional and unjustified use of force upon the person of another, however slight, or the intentional doing of a wanton or grossly negligent act causing personal injury to another.' " *Jesionowski v. Beck,* 937 F.Supp. 95, 105 (D.Mass.1996) (quoting *Commonwealth v. McCan,* 277 Mass. 199, 203, 178 N.E. 633, 634 (1931)). "[A]n officer authorized to make an arrest may use such force as is reasonably necessary to effect the arrest." *Julian v. Randazzo,* 380 Mass. 391, 396, 403 N.E.2d 931, 934 (1980); *accord Dean v. City of Worcester,* 924 F.2d 364, 369 (1st Cir.1991) (internal citation and quotation omitted). The standard for determining whether force is reasonable for assault and battery claims is "essentially the same" as the standard for determining if force is reasonable for Fourth Amendment excessive force claims. *Id.*

Because a plaintiff's "assault and battery claims will rise or fall in the same manner as his Fourth Amendment claims," *Jesionowski v. Beck,* 937 F.Supp. at 105, this court, with the agreement of the parties, did not specifically instruct the jury on the assault and battery claim. Rather, the parties agreed that judgment on the assault and battery claim would parallel whatever verdict was returned on the § 1983 excessive force claim. Thus, Officer Roussel's motion fails on the assault and battery count for the same reasons the motion is denied on the constitutional claim.

■■■■■ Similarly, Officer Roussel's self defense claim fails since, in order to use deadly force in self-defense, a person must have "reasonably and actually believed that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force." *Commonwealth v. Pike,* 428 Mass. 393, 396, 701 N.E.2d 951, 955 (1998) (internal quotation and citation omitted). Such a belief is only reasonable if the victim threatens "an action that would cause the defendant serious bodily injury." *Id.,* 701 N.E.2d at 955. Again, the evidence at trial supports the conclusion that Parker did not pose any such threat and Officer Roussel's motion is denied on this claim as well.

## IV. CONCLUSION

For the reasons detailed herein, Roussel's "Renewed Motion for Judgment as a Matter of Law" (Docket # 130) is DENIED.

### MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S MOTION FOR A NEW TRIAL [9]

### I. INTRODUCTION

The plaintiff, Richard Parker ("Parker"), brought this action alleging that his federal constitutional and state law rights were violated on February 20, 1998 when he was shot a number of times by police following a car chase which resulted in his arrest. Parker alleged several claims against three individual Swansea police officers as well as against the Town of Swansea (the "Town") itself.[10] However, all of his claims except for those brought pursuant to 42 U.S.C. § 1983 and the pendent assault and battery claims were either re-

---

9. The parties consented to transfer the case to this court for all purposes, including trial and the entry of final judgment, pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73.

10. Parker also originally named an individual officer from the Somerset Police Department and the Town of Somerset as defendants. However, the Town of Somerset prevailed on its motion for summary judgment on all counts alleged against it, and the Somerset defendants settled with the plaintiff shortly before trial.

solved at the summary judgment stage or withdrawn during the trial. A jury returned a verdict in favor of the Town and two of the police officers, William McGrath and Marc Haslam. Officer Richard Roussel ("Roussel") was found liable for compensatory damages in the amount of $250,000; no punitive damages were awarded.

Presently before the court is Parker's"Motion for New Trial" (Docket # 133) wherein he contends that this court committed prejudicial error during the trial by ruling as a matter of law that Swansea's deadly force policy does not violate the Fourth Amendment; by allegedly preventing him from introducing evidence that the tactics the Town actually trained its officers to use when extracting potentially armed suspects from vehicles differs from Swansea's written policy for that situation; and by allegedly improperly admitting hearsay documents. According to Parker, these errors entitle him to a new trial on all issues against defendants William McGrath, Marc Haslam, and the Town and to a new trial limited to punitive damages as to Roussel. In the instant motion, Parker also seeks an additur of $250,000 based on his conclusion that the amount of the jury's damages award is insufficient. For the reasons detailed herein, Parker's motion is DENIED.

## II. *DISCUSSION*[11]

### A. *Standard of Review*

■ A motion for a new trial pursuant to Fed.R.Civ.P. 59 "may be granted 'for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States … [.]' " *Polycarbon Indus., Inc. v. Advantage Eng'g, Inc.,* 260 F.Supp.2d 296, 303 (D.Mass.2003) (quoting Fed.R.Civ.P. 59(a)(1)). The decision whether to grant a motion for a new trial is committed to the discretion of the district court. *See Cantellops v. Alvaro–Chapel,* 234 F.3d 741, 744 (1st Cir.2000).

■ "It is, of course, within the discretion of the court to order a new trial if it is convinced that a trial was manifestly unfair because of an erroneous ruling." *Matton v. White Mountain Cable Constr. Corp.,* 190 F.R.D. 21, 23 (D.Mass.1999), and cases cited. However, "[a] motion for a new trial is not to be taken lightly" and should only be granted "when an error occurred in the conduct of the trial that was so grievous as to have rendered the trial unfair." *MacNeill Eng'g Co., Inc. v. Trisport, Ltd.,* 126 F.Supp.2d 51, 63 (D.Mass.2001) (internal citation and quotation omitted). The burden is on the movant to show that the court "committed error and that the error rendered the trial unfair." *Id.* at 64.

### B. *The Firearms Policy*

■ Parker first contends that this court erred by ruling as a matter of law that the Town's written deadly force policy, as found in its "Firearms" Policy (Trial Ex. 5),[12] comports with the requirements

---

**11.** The facts underlying this case are detailed in this court's Memorandum of Decision and Order on Defendant Richard Roussel's Renewed Motion for Judgment as a Matter of Law also issued on this date, and will not be repeated herein. However, references will be made to additional facts as needed in connection with the specific grounds raised in this motion.

**12.** The Town's general "Use of Force" policy (Trial Ex. 4) is limited to "non-deadly force" which is defined as "that degree of force which in the circumstances is neither likely nor intended to cause great bodily harm[.]" (*Id.* § 1(a)). Consequently, the use of firearms is treated in a separate "Firearms" policy (*see id.* § 1(b)) which was admitted as Trial Ex. 5.

of the United States Constitution. Parker asserts that the deadly force policy is both facially unconstitutional and unconstitutional as applied to the facts of this case. For the reasons that follow, this court disagrees.

The relevant portion of the Town's Firearms Policy reads as follows:

### GENERAL CONSIDERATIONS AND GUIDELINES

Police officers are issued firearms, and trained in their use, for self-protection and for the protection of the public in the community in which they serve. The use of a firearm is the highest degree of force a police officer may apply and the decision to use a firearm, in the performance of his duties, is the most critical judgment a police officer is called upon to make.

A police firearms policy should primarily reflect the fact that a police officer is authorized to use deadly force whenever it is reasonable and necessary to combat deadly force, used or threatened, if there is imminent danger of death or serious bodily injury to the officer himself, or to any other person unlawfully attacked.

The use of firearms to effect the arrest of a known felon, or to prevent the escape of a fleeing felon, should be restricted to those offenses where deadly force has been used or threatened and where the police officer has reasonable cause to believe that death or serious bodily injury could result unless the felon is immediately apprehended.

\* \* \* \* \* \*

### PROCEDURES

1. A police officer is authorized to use a firearm in the following circumstances if there is no other reasonable alternative available:

a. to defend himself or another person from unlawful attack when he has reasonable cause to believe there is imminent danger of death or serious bodily injury;

b. the use of deadly force (including firearms) to effect an arrest is not justifiable unless;

 i. the arrest is for a felony; *and*

 ii. the officer believes that the force employed creates no substantial risk of injury to innocent persons; *and*

 iii. the officer has probable cause to believe that:

 (a) the crime for which the arrest is made involved conduct indicating the use or threatened use of deadly force; *or*

 (b) there is a substantial risk that the person to be arrested will cause death or serious bodily harm if his apprehension is delayed.

See *Comm. v. Klein*, 372 Mass. 823, 363 N.E.2d 1313 (1977) and *Julian v. Randazzo*, 380 Mass. 391, 403 N.E.2d 931 (1980) . . . .

(Trial Ex. 5 at 13–1–13–2) (emphasis in original). Parker asserts that section (1)(b)(iii)(a) violates the standard set forth by the U.S. Supreme Court in *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), because it allows officers to use deadly force regardless of whether the suspect poses an immediate threat of physical harm to the officer or others. This contention fails for several reasons.

In *Tennessee v. Garner*, the Court addressed the issue of when police officers may use deadly force to prevent the escape of a fleeing suspect in accordance with the Fourth Amendment. The Court held that "[t]he use of deadly force to prevent the escape of all felony suspects,

whatever the circumstances, is constitutionally unreasonable .... Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.* at 11, 105 S.Ct. at 1701. However, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id.*

Parker focuses on the language of § 1(b)(iii)(a) and argues that the Policy allows an officer to use deadly force absent a threat of harm. This argument misconstrues the Policy. When read as a whole, it is clear that the Firearms Policy only authorizes the use of deadly force when the suspect poses a threat to the officer or others, consistent with the teachings of *Tennessee v. Garner.* The "General Considerations and Guidelines," which modify the specific "Procedures," emphasize that the Firearms Policy "primarily reflect[s]" the fact that before deadly force can be used by an officer, it must be "reasonable and necessary to combat deadly force, used or threatened, if there is imminent danger of death or serious bodily injury to the officer himself, or to any other person unlawfully attacked." (Trial Ex. 5 at 13–1). Parker's attempt to read the specific "Procedures" in isolation distorts the clear language of the Policy, and is without merit.

Moreover, in *Tennessee v. Garner,* the Court cited with approval the American Law Institute, Model Penal Code's standard for the use of deadly force. *See Tennessee v. Garner,* 471 U.S. at 15–17, 105 S.Ct. at 1703–04. Massachusetts, the Supreme Court noted, basically adopted the Model Penal Code's standard in the cases of *Commonwealth v. Klein,* 372 Mass. 823, 363 N.E.2d 1313 (1977) and *Julian v. Randazzo,* 380 Mass. 391, 403 N.E.2d 931 (1980). *See Tennessee v. Garner,* 471 U.S. at 17 n. 17, 105 S.Ct. at 1704 n. 17. These cases are cited in the Town's Firearms Policy, as quoted above. Moreover, the Model Penal Code's standard is substantively identical to the standard enumerated in the Firearms Policy. *See* Model Penal Code § 3.07(2)(b) (Official Draft 1962); *see also Tennessee v. Garner,* 471 U.S. at 6 n. 7, 105 S.Ct. at 1699 n. 7. Parker's contention that the Firearms Policy is inconsistent with *Tennessee v. Garner* is without merit.

■ Finally, even assuming, *arguendo,* that § 1(b) of the Firearms Policy could be unconstitutionally applied under some circumstances, this is not such a case. Thus, Parker contends that the police acted improperly in shooting him to prevent him from fleeing because he was not being arrested for a felony, nor was he being arrested for a crime which "involved conduct indicating the use or threatened use of deadly force[.]" (Trial Ex. 5 §§ 1(b)(i) & 1(b)(iii)(a)). However, the only evidence presented was to the effect that the officers did not shoot because they feared Parker was fleeing, but, rather, shot because they thought Parker was armed and perceived him as an immediate threat to themselves and others. Parker himself testified that the officers thought he had a gun. Shooting in self-defense is consistent with both *Tennessee v. Garner* and the Firearms Policy § 1(a) regardless of whether the underlying crime is a felony. (*See* Trial Ex. 5 § 2(b) (officer not authorized to use a firearm "to effect an arrest for a misdemeanor, except as provided in paragraph 1(a)")). Thus, Parker's contention that the officers erroneously concluded that he had committed a felony, which according to Parker is the only category of crimes for which they could have used

deadly force, is unavailing. For all these reasons, the Firearms Policy is neither facially unconstitutional nor unconstitutional as applied in this case and Parker's motion is denied on these grounds.

### C. *The High Speed Pursuit Policy*

Parker next argues that this court erred by preventing him from introducing evidence that the Town's policies relating to "high risk" motor vehicle stops, which identify tactics officers are to use when extracting potentially dangerous suspects from the suspect's vehicle, differed from the training the Town's officers actually received. Consequently, argues Parker, he was precluded from establishing the Town's liability based on improper training. However, the court did not limit Parker in the manner he claims and his motion is denied on this basis.

The Town's policies are included in a written "High Speed Pursuit" Policy, (in particular § 16(d) thereof). The entire Pursuit Policy was admitted as Trial Ex. 6 early in the case. Parker had the Policy when he questioned each individual defendant as to whether their actions in extracting Parker from his jeep were consistent with the training they received.

In addition, Parker called his own expert to testify to the generally accepted methods in the law enforcement field for conducting such high risk stops and extensively cross-examined the defendants' corresponding expert on this subject. Parker also questioned these experts as to whether the defendants' actions comported with the Town's Pursuit Policy. The jury was thus well equipped to juxtapose

the defendants' training with § 16(d) of the Pursuit Policy. While the jury, by returning a verdict in the Town's favor, obviously disagreed with Parker that the officers' training in this area was unconstitutional, Parker was in no way prevented from presenting his case. Therefore, Parker's motion for a new trial on this basis is denied.

### D. *The Mental Health Records*

Parker also contends that the court improperly admitted into evidence some records of his pre and post-incident mental health treatment (Trial Ex. 23) [13] because the (unspecified) records are unfairly prejudicial, inadmissible hearsay, and contain statements for which the declarant has not been identified. Because each of these arguments lacks merit, Parker's motion is denied on this ground.

■■■ As an initial matter, the court spent a great deal of time reviewing the records during the trial after Parker made generalized objections to some of the records while seeking the admission of others. After weighing the probative value of the mental health records against any unfairly prejudicial effect of admitting the evidence, this court found, and continues to find, that the records as redacted by the court were properly admitted. *See, e.g., United States v. Carlos Cruz*, 352 F.3d 499, 505–06 (1st Cir.2003) (district court has discretion in balancing probative value against unfairly prejudicial effect) (citing Fed.R.Evid. 403). The records are relevant to Parker's claims for damages, which include claims for psychological harm and

---

**13.** Although Exhibit 23 is marked as a "Plaintiffs Exhibit" [sic], the records ultimately admitted were those found admissible by the court after an extensive meeting with the parties outside the presence of the jury, and include records proposed by all parties. After it became clear that the plaintiff had the same general objections to many of the documents, the court took the remainder of the documents under advisement, reviewed them, redacted portions, and collectively marked the records as a plaintiff's exhibit. While the parties' objections are on the record, the lengthy meeting was not all on the record.

inability to work, both allegedly attributed to the shooting. The records contained in Exhibit 23 are relevant on the issue whether these damages were caused by the shooting, as well as to the existence and extent of any damages. Parker cannot now argue that it was prejudicial for the jury to learn that he had a substance abuse problem and had participated in mental health treatment before the incident since he himself opened the door to these topics by testifying to both of these facts, including the fact that he had been hospitalized for psychiatric issues shortly before the incident. Parker also called his treating psychologist, Dr. Willie Coleman, who testified to Parker's substance abuse and pre and post-incident mental health, which further put these subjects at issue.

Moreover, the records were redacted to remove any highly inflammatory information, such as Parker's involvement with the police and/or legal system based on events not related to this lawsuit. The court also issued a limiting instruction to the jury that the mental health records were not evidence of what occurred on February 20, 1998. Therefore, this court concludes that Parker's argument that the admission of the records was unduly prejudicial is without merit.

 Equally unpersuasive is Parker's objection to the records as constituting "hearsay opinion declarations." The records themselves are admissible as business records pursuant to Fed.R.Evid. 803(6), which allows for the admission of "opinions, or diagnoses." The statements in the documents are attributed to identifiable declarants. Each medical record bears the name of the individual(s) entering the information, at least one of whom was deposed prior to trial. Such identifying information, which establishes that the entries were made by, or contain information conveyed by, "persons with knowl-edge," supports the conclusion that the documents are admissible as valid business records. *See Petrocelli v. Gallison,* 679 F.2d 286, 289–91 (1st Cir.1982) (while complete absence of any indication as to where information in medical records came from rendered entry inadmissible, with proper identification of declarant medical records may be admissible under Rule 803(6) while patient statements contained in such records could be admissible based on combination of Rules 803(6) and 803(4)). Similarly, the documents identify the individuals unaffiliated with the hospital who provided information contained in the reports, including Parker and his father. These statements constituted "[s]tatements made for purposes of medical diagnosis or treatment" and are admissible in accordance with Fed.R.Evid. 803(4). (*See, e.g.,* Trial Ex. 23 at 8, 20, 52, 59, 104, 152). For all these reasons, Parker's motion for a new trial based on the improper admission of Exhibit 23 is denied.

### E. *The Amount of the Jury's Damages Award*

Finally, Parker contends that the jury's damages award is inadequate and asks this court for an additur of $250,000. Because additur is constitutionally proscribed and because the jury's damages award was rationally based on the evidence, Parker's motion is denied.

 Pursuant to the Seventh Amendment of the U.S. Constitution, "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." Because it is well settled that "the Seventh Amendment flatly prohibits federal courts from augmenting jury

verdicts by additur," Parker cannot obtain additional damages on this basis. *Campos–Orrego v. Rivera*, 175 F.3d 89, 97 (1st Cir.1999) (citing *Dimick v. Schiedt*, 293 U.S. 474, 486–87, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1935)).

■■■ Nevertheless, an "inadequate damages award may constitute sufficient reason for a new trial." *Phav v. Trueblood, Inc.*, 915 F.2d 764, 766 (1st Cir. 1990). However, the party challenging the award, especially an award for personal injuries, "bears a particularly heavy burden" and the court "rarely will override the jury's judgment on the appropriate amount of damages to be awarded." *Milone v. Moceri Family, Inc.*, 847 F.2d 35, 37 (1st Cir.1988) (internal citation and quotation omitted). As stated by the First Circuit, the jury "is free to run the whole gamut of euphonious notes—to harmonize the verdict at the highest or lowest points for which there is a sound evidentiary predicate, or anywhere in between—so long as the end result does not violate the conscience of the court or strike such a dissonant chord that justice would be denied were the judgment permitted to stand." *Id.* Accordingly, invalidating a jury's award is appropriate only where "after scanning the evidence in the light most congenial to the nonmovant," the verdict falls below "any rational appraisal or estimate of the damages that could be based on the evidence before the jury." *Id.* at 37–38 (internal citation and quotation omitted). *Accord Gil de Rebollo v. Miami Heat Assocs., Inc.*, 137 F.3d 56, 62 (1st Cir.1998) ("Where the allegation of an improper verdict is based solely on the amount of the damage award, the circumstances under which a trial court may overturn a verdict are more limited."). This is not such a case.

■■■ Here, the jury had before it all the evidence, including Parker's medical bills (Trial Ex. 19). At the most, these bills totaled $139,053.71. The jury returned a verdict in Parker's favor for $250,000 in compensatory damages. Even fully valuing the medical expenses, this award is substantially higher than such expenses alone and is rationally based on the evidence.

Parker does not offer any basis to support his contention that this award is inadequate. He merely asserts, in a conclusory manner, that because he was shot eight times and proved $189,000 in "special damages," the jury's award is grossly deficient. However, he fails to explain how he proved $189,000 in damages, why the amount awarded is too low, or why the extra $250,000 is necessary to redress his injuries. Parker's bald assertions are simply not enough to carry his "particularly heavy burden" and his motion is denied as to the damages award. The award does not "violate the conscience of the court," nor does the court find that "justice would be denied were the judgment permitted to stand." *Milone v. Moceri Family, Inc.*, 847 F.2d at 37.

## III. CONCLUSION

For the reasons detailed herein, Parker's "Motion for New Trial" (Docket # 133) is DENIED.