Andrew GERAKARIS

v.

Robert CHAMPAGNE, Martin Cohan, Charles Werner, J. Stephen Begley, Dean Armstrong, Charles Reardon, Harry Coppola, and Nicholas Mavroules.

Civil A. No. 94–12341–RGS.

United States District Court, D. Massachusetts.

Jan. 30, 1996.

Thomas S. Francis, The Law Offices of Thomas S. Francis, Boston, MA, for Andrew Gerakaris.

Andrew Gerakaris, Peabody, MA, pro se.

Daniel B. Kulak, Office of City Solicitor, Peabody, MA, for Robert Champagne, Martin Cohan, Charles Werner, Stephen Begley, Officer Armstrong, City of Peabody.

Elizabeth M. Fahey, Joseph L. Bierwirth, Morrison, Mahoney & Miller, Boston, MA, for Charles Reardon and Harry Coppola.

Michael L. Altman, Charles J. Speleotis, Rebecca L. Tepper, Rubin & Rudman, Boston, MA, for Nicholas Mavroules.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS

STEARNS, District Judge.

The plaintiff, Andrew Gerakaris, is the erstwhile son-in-law of defendant Nicholas Mavroules, a former Mayor of Peabody and United States Congressman. Following his separation from Mavroules's daughter, Gerakaris became a cooperating witness in an FBI investigation into Mavroules's official conduct. In this civil action, Gerakaris alleges that:

[a]s a result of Gerakaris's knowledge of Mavroules's criminal activities and his cooperation with federal law enforcement officers investigating Mavroules, Mavroules engaged in, and conspired with the other defendants to engage in, a systematic campaign to threaten, intimidate, and coerce Gerakaris to prevent him from testifying freely, fully, and truthfully against Mavroules.

Second Amended Complaint, at 3. The Second Amended Complaint is in three counts alleging violations of 42 U.S.C. § 1983, 42 U.S.C. § 1985(2), and M.G.L. c. 12 § 11I. Jurisdiction is based on the federal claims presented in counts I and II.

## FACTS

The facts alleged in the Second Amended Complaint, which for present purposes must be deemed true, are these. In May of 1991,

seeking to dissuade Gerakaris from cooperating in the Mavroules investigation, the defendants embarked on a concerted campaign of intimidation. On November 27, 1991, Gerakaris visited his mother in Peabody. A restraining order was in effect enjoining Gerakaris from approaching the residence of his ex-wife (Mavroules's daughter). At approximately 2:30 p.m., defendants Martin Cohan and Dean Armstrong, who are Peabody police officers, arrested Gerakaris at his mother's home for allegedly violating the restraining order.[1] Gerakaris informed the officers that he suffered from several illnesses, including Krohn's Disease, for which he was taking prescription medicines. The officers refused to permit Gerakaris to retrieve his medications before transporting him to the Peabody police station.

Defendants Cohan, Armstrong, Chief Robert Champagne, Stephen Begley and Charles Werner (all Peabody police officers), were present at Gerakaris's booking. Gerakaris again complained about his medical and dietary needs. The officers deliberately delayed Gerakaris's booking until after the Peabody District Court had closed. Gerakaris was as a result denied an immediate appearance before a judge. Bail was set at $15,000 later that night at the station by a Clerk Magistrate associated with Mavroules.

Gerakaris was unable to make bail. Champagne told Gerakaris that he had informed defendant Charles Reardon, the Sheriff of Essex County, and/or defendant Harry Coppola, a Special Sheriff and Reardon's chief assistant, that Gerakaris would be sent to the Middleton House of Correction. Reardon and Coppola were responsible for the administration at Middleton. Both were friends of Mavroules and knew Gerakaris because of his past family relationship with Mavroules (and because Gerakaris had at one time worked with them), and both were aware of Gerakaris's medical condition.

Gerakaris was transported to Middleton at 8:00 p.m. on November 27, 1991, and re-

mained there until approximately noon on November 29, 1991. Gerakaris alleges that, "[u]pon information and belief, Reardon and Coppola, with deliberate indifference to Gerakaris's rights, directly or indirectly, directed certain jail personnel to abuse and harass [him]...." Second Amended Complaint, at 7. The alleged abuse included the following: requiring Gerakaris to wear jail issue pants, a short sleeve shirt, and sandals, while other prisoners were allowed to wear warm clothing; placing Gerakaris in a small, cold solitary confinement cell that lacked a mattress, pillow, or blanket; denying Gerakaris's request for additional blankets or clothing; denying him visitation rights by misleading visitors about his location; denying him his prescription medication; and providing Gerakaris with no food during his forty hour incarceration other than a plate of mashed potatoes soaked in urine.

On November 29, 1991, Gerakaris was taken to Peabody District Court. In setting a $2,500 bail, the judge relied in part on a false written statement by Werner accusing Gerakaris of an attempted arson. The judge ordered Gerakaris not to travel to Massachusetts without prior court permission. The judge also ordered the Peabody Police to preserve records of the telephone call of November 27, 1991, allegedly reporting Gerakaris's violation of the restraining order. (The records, if they existed, were destroyed.)

Thereafter, the defendants conspired to cause Gerakaris's bail to be revoked. To that end, in December of 1991, Cohan, Werner, Begley, and/or Champagne, contacted the Aroostock County Maine Sheriff's Department and asked the Sheriff to obtain a warrant to search Gerakaris's residence for illegal drugs and guns. The request was based on an unnotarized copy of a false affidavit reciting "facts" from a year earlier. The defendants further sought permission to be present during the search. Gerakaris

---

1. Gerakaris denies having violated the restraining order, and alleges that defendant Robert Champagne, the Peabody Police Chief, ratified defendant officer Stephen Begley's groundless decision to order the arrest. However, Gerakaris is ultimately plead guilty to the violation, thus barring his Fourth Amendment claims based on the allegedly illegal arrest. (For his part, Gerakaris alleges that his "fear that perjured testimony would be offered against him ... led to this plea," Second Amended Complaint, at 13, but this fact, even if it is true, has no bearing.)

alleges "[u]pon information and belief, [that] Cohan, Werner, Begley, and Champagne requested to be present during the search for the purpose of planting illegal items."

At the time the defendants made their request to the Sheriff, Gerakaris had begun cooperating with federal authorities in the investigation of Mavroules. The Aroostock Sheriff's Department never searched Gerakaris's residence, but in light of the defendants' allegations, the FBI did so, although without finding any illegal items.

On October 15, 1992, Gerakaris appeared in the Peabody District Court on a routine pretrial matter. Mavroules, who at the time was the subject of intense media attention, encouraged reporters to attend the hearing because something "interesting" was going to occur. Gerakaris learned for the first time in court that Werner and Cohan had falsely alleged that he had violated his conditions of bail by traveling to Massachusetts without permission on May 10, 1992, and on September 30, 1992. Gerakaris's bail was not revoked, however, because of the witnesses who claimed to have seen Gerakaris in Massachusetts, only Werner was willing to give a sworn statement. Gerakaris was able to show that at the time of Werner's alleged "sighting," Gerakaris was in a doctor's office in northern Maine.

Gerakaris also alleges that, in part because of this pattern of threats, intimidation, and coercion by defendants, he was forced to enter the Federal Witness Protection Program on December 10, 1992, "at great financial and emotional cost to himself and his family." Second Amended Complaint, at 12.

## DISCUSSION

Although Gerakaris alleges a broad and continuing conspiracy involving all of the defendants, the acts alleged in the Second Amended Complaint place the defendants in three distinct groups. The first includes Champagne, Cohan, Werner, Begley and Armstrong, the officers allegedly involved in Gerakaris's illegal arrest and detention; the second includes Reardon and Coppola, who are allegedly responsible for Gerakaris's mistreatment at the Middleton House of Correction; and finally, Mavroules, who allegedly orchestrated the activities of the other defendants.

The first two groups of defendants have filed motions to dismiss that are alternatively styled as motions for summary judgment. As discovery has yet to take place, the motions for summary judgment are premature. (Mavroules has properly filed only a motion to dismiss). I point this out because all of the defendants dispute the substance of the facts alleged in the Amended Complaint. The defendants' claims of qualified immunity, for example, are based in part on Gerakaris's perceived inability to prove facts, such as the "intentionality" of the officers' conduct and the existence of an "affirmative link" between the supposedly inhumane jail conditions and the actions of defendants Reardon and Coppola. At this early stage there is no question but that the allegations of the Amended Complaint are sufficient to describe conduct, if proved, that "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have [then] known." See *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

 Gerakaris argues that the motions filed by the first two groups of defendants, treated as motions to dismiss, suffer from two technical defects. First, he complains that Reardon and Coppola filed their answers to the Second Amended Complaint on July 12, 1995, and their motion to dismiss two days later, while Fed.R.Civ.P. 12(b) requires that "[i]f [a] defendant decides to assert a Rule 12(b) defense by motion, then he must do so before filing his answer." 5A C. Wright and A. Miller, Federal Practice and Procedure, § 1361 (1990). Second, Gerakaris claims that the first two groups of defendants failed to comply with Local Rule 7.1(A)(2), which requires counsel to confer prior to filing an adversary motion. The defendants have not responded to either argument, but neither warrants much by way of discussion. First, in their answers to the Second Amended Complaint, the defendants preserved the motions by raising the failure to state a claim as an affirmative defense. See 5A C. Wright and A. Miller, Federal Practice and Procedure § 1361 (1990) ("[T]he court must deny

any motion made after a responsive pleading as being too late. However, courts have allowed untimely motions if the defense has been previously included in the answer.") Second, while a litigant's failure to observe the Local Rules invites sanctions, omitting to confer prior to filing a motion certain to be opposed does not warrant so severe a sanction as summary denial.

### 42 U.S.C. § 1983

In order to prevail on his § 1983 claim, Gerakaris must show that the defendants, while acting under color of state law, deprived him of a right guaranteed by the Constitution or laws of the United States. Gerakaris asserts that his freedom of speech, freedom from illegal arrest and detention, his right to necessary medical care while in custody, his right to substantive due process, and his "right to be free from the knowing use of perjured testimony" were all violated.

■ Gerakaris asserts that the defendants' attempts to intimidate him from testifying abridged his First Amendment right to speak freely about Mavroules's corrupt activities. The defendants argue that Gerakaris's allegations are too vague "to satisfy even the minimum notice pleading requirements...." I disagree. If the allegations are true, they describe a paradigm example of the abuse of official power intended to silence citizen protest. See *Hague v. Committee for Industrial Organization*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); *Miller v. Washington State Bar Assoc.*, 679 F.2d 1313 (9th Cir. 1982); *Glasson v. City of Louisville*, 518 F.2d 899 (6th Cir.1975).

■ The defendants next argue that the deprivation of medical care alleged by Gerakaris is not "sufficiently serious" to support a § 1983 claim, and that under *Farmer v. Brennan*, — U.S. —, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), and *Hudson v. McMillian*, 503 U.S. 1, 8–9, 112 S.Ct. 995, 999–1000, 117 L.Ed.2d 156 (1992), the brevity of Gerakaris's detention precludes a constitutional claim based on inhumane conditions of deten-

tion. See Mavroules Memorandum in Support at 7; Reardon and Coppola Memorandum in Support, at 6. See also *Hutto v. Finney*, 437 U.S. 678, 686–687, 98 S.Ct. 2565, 2571–2572, 57 L.Ed.2d 522 (1978) ("A filthy, overcrowded cell and a diet of 'grue' [obs.] might be tolerable for a few days and intolerably cruel for weeks or months."); *Whitnack v. Douglas County*, 16 F.3d 954, 958 (8th Cir.1994) (no violation of pretrial detainee's due process rights where exposure to feces and vomit in a contaminated cell lasted only twenty-four hours). The Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981), but Gerakaris was entitled to minimally "adequate food, clothing, shelter and medical care" while in the custody of the State. *Farmer v. Brennan*, — U.S. at —, 114 S.Ct. at 1976. While the duration of the confinement is a consideration, it must be measured against the intolerability of the conditions endured and the egregiousness of the defendants' conduct. The objectives of pretrial detention are to insure the detainee's presence at trial and to maintain security in the jail. *Bell v. Wolfish*, 441 U.S. 520, 539–540, 99 S.Ct. 1861, 1874–1875, 60 L.Ed.2d 447 (1979).[2] The Due Process Clause, however, prohibits the infliction of punishment on a person by the State prior to a judgment of conviction. The issue here is whether the conditions of Gerakaris's confinement were intended to further a legitimate state interest or were intended instead as punishment. By this standard Gerakaris's allegations state a cognizable due process violation. See *Villanueva v. George*, 659 F.2d 851, 853–854 (8th Cir.1981). Defendants also argue that they were unaware of Gerakaris's medical needs, and thus cannot be held liable for failing to provide for them. See *Farmer v. Brennan*, — U.S. at —, 114 S.Ct. at 1979 ("[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health...."). Gerakaris has alleged, however, that he twice reminded the defendants of

---

**2.** Under the federal Bail Reform Act of 1984 (but not under Massachusetts law as in effect at the time of Gerakaris's arrest), the dangerousness of the offender may, in some circumstances, justify an order of pretrial detention.

his need for prescription medication and a special diet.[3] "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways." Id. at ——, 114 S.Ct. at 1981. A detainee's Fourteenth Amendment due process right to adequate medical care is at least as great as the corresponding right of an inmate under the Eighth Amendment. See *Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983); *Johnson v. Summers*, 411 Mass. 82, 86, 577 N.E.2d 301 (1991). So considered, Gerakaris has stated a viable due process claim that defendants deliberately ignored his medical needs. See *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976).

▉▉▉ The arresting officers argue that since Gerakaris plead guilty to violating the restraining order (the crime for which he was arrested), he cannot use his arrest and subsequent detention as the basis of a § 1983 Fourth Amendment claim. See *Heck v. Humphrey*, —— U.S. ——, ——, 114 S.Ct. 2364, 2372, 129 L.Ed.2d 383 (1994). They further argue that the incident involving the Aroostock County Sheriff's Office is not actionable because there is no allegation that the Sheriff actually conducted a search, and that even if the search by the FBI was instigated as a result of their request, Gerakaris has failed to allege, factually or otherwise, that the search violated the Fourth Amendment. To this point, the defendants are correct. The Amended Complaint, however, also alleges that Gerakaris's booking was deliberately prolonged in order to obstruct his access to a bail hearing before a judge. This is sufficient to state a violation of substantive due process under the Fourteenth Amendment. See *Morello v. James*, 810 F.2d 344, 346–347 (2d Cir.1987). Cf. *County of Riverside v. McLaughlin*, 500 U.S. 44, 56, 111 S.Ct. 1661, 1669, 114 L.Ed.2d 49 (1991).

▉▉▉ Finally, the defendants, contend that Gerakaris has failed to allege with sufficient specificity the details of the alleged conspiracy. In support, they cite numerous pre-*Leatherman* opinions. See *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). Although *Leatherman* applies only to § 1983 claims against municipalities, the logic of the Court's reaffirmation of the sufficiency of the rule of notice pleading in that context has no less force in cases involving civil rights claims against individual government officials. See id. at 167–68, 113 S.Ct. at 1163 (reserving the issue); *Feliciano v. DuBois*, 846 F.Supp. 1033, 1042 (D.Mass.1994) ("the extent to which this court can now rely upon decisions predating *Leatherman* is in doubt."); *Lowden v. William M. Mercer, Inc.*, 903 F.Supp. 212, 216 n. 1 (D.Mass.1995) ("[the argument] that the complaints require detailed factual recitations because civil rights and conspiracy claims are subject to heightened standards of pleading is unconvincing."); *Penney v. Town of Middleton*, 888 F.Supp. 332, 337 (D.N.H.1994) ("[a]llegations of civil rights violations pursuant to 42 U.S.C.A. § 1983 need not meet a heightened pleading standard.") In any event, the pre-*Leatherman* requirement that the plaintiff "set forth minimal facts, not subjective characterizations, as to who did what to whom and why," *Dewey v. University of New Hampshire*, 694 F.2d 1, 3 (1st Cir.1982), is satisfied by Gerakaris's Second Amended Complaint.

### M.G.L. c. 12 § 11I

▉▉▉ Gerakaris has plead a prima facie case of threats, intimidation and force intended to deprive him of his civil rights. See *Bally v. Northeastern University*, 403 Mass. 713, 717, 532 N.E.2d 49 (1989). The defendants' only response is to challenge Gerakaris's ability to *prove* his factual allegations. Therefore, their motions to dismiss this count must be denied.

### 42 U.S.C. § 1985

This is by far the most interesting aspect of the case. Enacted as part of the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985 creates a

---

**3.** "A medical need is 'serious' if it is one that has been diagnosed by a physician as mandating treatment." *Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 208 (1st Cir.1990).

cause of action against persons who conspire to prevent others from testifying in court. Section 1985 contains three subsections. The first deals with the obstruction of public officers in the performance of their official duties, the second with intimidating a party, witness, or juror from fully or freely participating in a court case, and the third with attempts to deprive a person of the equal protection of the rights and privileges guaranteed under the laws.

The statute reads:

§ 1985. Conspiracy to interfere with civil rights

(1) Preventing officer from performing duties

If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties;

(2) Obstructing justice; intimidating party, witness, or juror

If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of imped-

ing, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;

(3) Depriving persons of rights or privileges

If two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

██ As a witness in a federal grand jury investigation, Gerakaris alleges a cause of action under the second subsection, which refers to any "party, witness, or juror." The statute is clumsily worded, because each subsection describes a different form of conduct giving rise to a cause of action, while only the

third subsection, which refers simply to "parties," contains a remedial clause. See *Kush v. Rutledge*, 460 U.S. 719, 724, 103 S.Ct. 1483, 1487, 75 L.Ed.2d 413 (1983) ("The civil remedy for a violation of any of the subsections is found at the end of § 1985(3)"). Because of the awkward construct of the statute, a split of authority has arisen over whether witnesses and jurors, or just parties, have standing to sue.

In *David v. United States*, 820 F.2d 1038, 1040 (9th Cir.1987), a non-party witness who alleged she was harassed and threatened by the defendants was denied standing:

> [a]llegations of witness intimidation under § 1985(2) will not suffice for a cause of action unless it can be shown the *litigant* was hampered in being able to present an effective case. Since David has not shown she was a party to the actions in which she was intimidated, she can show no injury under § 1985(2). (Citations omitted).

This reading of the statute, which was also adopted by the Seventh Circuit in *Rylewicz v. Beaton Services, Ltd.,* 888 F.2d 1175, 1180 (7th Cir.1989) ("monetary relief [is available] only to a 'party' and not a mere witness"), assigns literal significance to the placement of the remedial language at the end of the statute.[4] The word "party," in the absence of the words "witness" and "juror," is construed to express a legislative intent to deny nonparty witnesses and jurors standing to bring a private action.

In *Brever v. Rockwell Int'l Corp.,* 40 F.3d 1119, 1125 n. 7 (10th Cir.1994), the Tenth Circuit disagreed.

> Defendants suggest that the remedial portion of the statute located in section 1985(3) limits standing to parties only. The language relied on by defendants provides that "in any case of conspiracy set forth in [section 1985] … the *party* so injured or deprived may have an action for the recovery of damages … against any one or more of the conspirators." 42 U.S.C. § 1985(3) (emphasis added). Un-

like defendants, we do not read the word "party" so literally as to mean "named party to an action," especially where the preceding portion of the statute specifically identifies witnesses as protected persons. Moreover, defendants' suggested limitation on standing would effectively emasculate section 1985(2) in the context of this case. Here, we have a federal grand jury proceeding where the only "party," according to defendants' interpretation of the statute, would be the United States. We disagree with such a narrow reading, and to the extent that defendants cite cases to the contrary we hold otherwise.

> The Tenth Circuit's view comports better with the history and goals of the statute than does the more grammatically oriented reading of the Ninth and Seventh Circuits. 42 U.S.C. § 1985 was originally enacted as § 2 of the Civil Rights Act of 1871, 17 Stat. 13. As the Supreme Court has observed, "[t]he length and style of § 2 [which originally consisted of one long paragraph containing two run-on sentences] … make it somewhat difficult to parse." *Kush,* 460 U.S. at 724, 103 S.Ct. at 1486. However, the second sentence of the original § 2 contained the remedial portion of the statute, and it made no distinction between a party, witness, or juror, using instead the word "person" to signify all three protected classes.

> And if any one or more persons engaged in any such conspiracy shall do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby any *person* shall be injured in his person … *the person so injured* or deprived of such rights and privileges may have and maintain an action for the recovery of damages occasioned by such injury or deprivation of rights and privileges against any one or more of the persons engaged in such conspiracy, such action to be prosecuted in the proper district of circuit court of the United States. [Emphasis added.]

As the *Kush* Court explained, "[a]s now codified in § 1985, the long paragraph is divided

---

4. An obviously discomforted Seventh Circuit couched its parsing as an alternative holding in the case. See *Rylewicz,* 888 F.2d at 1180–1181 ("We need not rest on a literal construction of 'party' in Sections 1985(3) and 1986, however, because both limit liability to one who has been 'injured' or 'deprived….' There has been no allegation that [the plaintiff] was in fact hampered from testifying 'freely, fully, and truthfully,' in the words of Section 1985(2).").

into three subsections ... [and t]he civil remedy for a violation of any of the subsections is found at the end of § 1985(3). *The reclassification was not intended to change the substantive meaning of the 1871 Act.*" *Kush,* 460 U.S. at 724, 103 S.Ct. at 1487. (Emphasis added.) Thus, § 1985 should be read to enable any person who is the victim of threats, intimidation or force intended to deter participation in a court proceeding to maintain a cause of action, and not just the parties to a case. As the Tenth Circuit explained, this result is particularly appropriate where, as here, the only party to the underlying judicial proceedings who would otherwise have standing to sue would be the United States. See *Brever,* supra at 1125 n. 7; cf. *Burch v. Snider,* 461 F.Supp. 598, 600 (D.Md.1978) (the Attorney General of the State of Maryland lacks standing to bring a § 1985(2) action on behalf of a witness who had testified for the state in previous civil litigation). As the point of the statute is not so much to provide a remedy to the injured party as it is to deter potential offenders from interfering with the judicial process, the most reasonable means of ensuring that this goal is served is to give standing to witnesses and jurors to bring suit.

### ORDER

For the foregoing reasons, defendants' motions to dismiss Gerakaris's Fourth Amendment claims are *ALLOWED.* In all other respects, defendants' motions to dismiss are *DENIED.*

SO ORDERED.