**CONVERSE INC., Plaintiff,**

v.

**REEBOK INTERNATIONAL LTD., Defendant.**

**No. CIV.A. 01–12249 RCL.**

United States District Court, D. Massachusetts.

Aug. 5, 2004.

Shepard Davidson, Burns & Levinson, Boston, MA, Larry C. Jones, Alston & Bird LLP, Charlotte, NC, for Reebok International Limited, Defendant.

William D. DeVaul, Lucy Fowler, Michael B. Keating, Anthony Mirenda, Foley Hoag LLP, Boston, MA, for Converse, Inc. Plaintiff.

*MEMORANDUM AND ORDER ON MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION FOR CONTEMPT AND ENFORCEMENT OF THE CONSENT JUDGMENT AND ORDER*

LINDSAY, District Judge.

Before the court is a motion filed by Converse Inc. ("Converse") for contempt and enforcement of a consent decree entered in favor of Converse against Reebok International Ltd. ("Reebok") on December 28, 2001. The motion was referred to Magistrate Judge Joyce London Alexander for a report and recommendation. On May 14, 2004, Judge Alexander issued findings and recommendations in which she recommended that the motion for contempt be denied and that sanctions be imposed on Converse in the form of a requirement that Converse reimburse Reebok for attorneys' fees and costs incurred by Reebok in preparing its initial opposition to the motion for contempt.

After conducting a *de novo* review of the issues raised by the motion, I accept the magistrate judge's recommendations. I add the following observations, however, to address some of the plaintiff's objections.

Judge Alexander found that "the quoted part of paragraph 3(a) [of the consent decree] and the entirety of paragraph 3(b) fail pursuant to Rule 65(d) for lack of specificity," explaining that "[t]he requirements in those paragraphs are 'do not break the law' admonishments." *See* Findings and Recommendations on Pl.'s Mot. for Contempt and Enforcement of the Consent Judgment and Order ("Findings and Recommendations") at 16. The plaintiff objects on two grounds: (1) that Judge Alexander did not clearly specify which part of paragraph 3(a) fails for lack of specificity; and (2) that courts routinely

honor consent decrees that quote statutory language.

While there may be some superficial ambiguity about which portion of paragraph 3(a) was found to be deficient, any confusion is easily dispelled by a careful review of the magistrate judge's findings. Judge Alexander found that Reebok had not used the designation or mark "ALL–STAR" or any of the other Converse Trademarks. Her consideration of these two prohibitions found in paragraph 3(a) suggests that she did not intend to find that they presented a Rule 65(d) problem. The only portion of paragraph 3(a) that she found to be deficient, then, was the third prohibition containing language quoted from the Lanham Act. *See* 15 U.S.C. § 1125(a)(1)(A).

As to the plaintiff's second objection, I agree with Judge Alexander that, in some cases, a consent decree containing abstract legal language will not comply with Rule 65(d). *See International Longshoremen's Assn., Local 1291 v. Philadelphia Marine Trade Assn.*, 389 U.S. 64, 76, 88 S.Ct. 201, 19 L.Ed.2d 236 (noting that abstract conclusions of law are not "operative command[s] capable of enforcement"). This is one of those cases. In *Sterling Drug, Inc. v. Bayer AG*, the Second Circuit held that "where the parties share rights to the 'Bayer' mark ..., requiring [the defendant] to guess—on pain of contempt—at what conduct the Lanham Act proscribes

is too onerous a burden." 14 F.3d 733, 748–49 (2d Cir.1994). Although Reebok does not share the rights to the *designation or mark* "ALL–STAR" with Converse, Reebok has not, by entering into the consent decree, surrendered all rights to the use of the *term* "ALL–STAR." Reebok, in full compliance with the consent decree and the Lanham Act, could use "ALL–STAR" as a descriptive term referring to the NBA All–Star game. Thus, Reebok is in the same position as the defendant in *Sterling*. That is, Reebok must guess at what conduct the Lanham Act might proscribe, given that some uses of the term "ALL–STAR" would certainly be permissible under the Act.[1] Reebok's interpretive dilemma is especially acute because there has been no prior judgment of infringement and thus no example of what would be found to infringe.

Additionally, I agree with Judge Alexander's findings that the accused shoes do not violate the consent decree, and I spill ink here only to make clear my reasons for accepting these findings. First, the appearance of the term "ALL–STAR" in the names of the shoes and within the NBA logo on the sockliner does not violate the consent decree's prohibition against use of "the designation or mark 'ALL–STAR'" because the term does not function as a source-identifier in this context. Instead, it is a descriptive term clearly meant to refer to the then upcoming NBA All–Star

---

1. I note, however, that paragraph 3(b) may be parsed such that it does not fail in its entirety. I find that the first prohibition contained in paragraph 3(b), barring the use of "any colorable imitation of the Converse Trademarks," meets Rule 65(d)'s specificity requirements. *See Wolfard Glassblowing Co. v. Vanbragt*, 118 F.3d 1320, 1323 (9th Cir.1997). This minor quibble with the magistrate judge's findings is neither here nor there, as Converse has made no showing that Reebok's shoes are likely to cause consumer confusion. By definition, proving a "colorable imitation" requires such

a showing. *See id.* at 1322 (defining the term "colorable imitation" as "any mark which so resembles a registered mark as to be likely to cause confusion or mistake or to deceive."). In *Wolfard*, the Ninth Circuit held that a plaintiff, who already has a judgment that the defendant has infringed, need not prove a likelihood of consumer confusion. *Id.* But, as Judge Alexander noted, Converse does not have such a judgment, and thus the "duty to stay well away" from Converse's mark does not apply with the same force as it did in *Wolfard*.

Game. Second, the registration for the placement mark (registration number 1,490,262) depicts, in the words of the registration itself, "a shoe design shown in dotted lines demonstrating the placement of a circular ankle patch on the side of the shoe." The patch on the accused shoe, however, is square, not circular, and it does not resemble the Chuck Taylor emblem pictured in the registration. If Converse believes that Reebok has infringed its trademarks, it may file the appropriate action, but Converse has presented no clear and convincing evidence that Reebok's shoes violate the terms of the consent decree now at issue.

■ Finally, I must address the issue of sanctions. In her report, Judge Alexander addresses the bases in law and fact for sanctioning Converse's deliberate violation of Local Rule 7.1, and I endorse her reasoning and conclusion wholeheartedly. Here, I address only Converse's objections to the severity of the sanction.

In its objections, Converse does not dispute the finding that its counsel violated Rule 7.1. Instead, Converse claims that the sanctions proposed by the magistrate judge are grossly disproportionate to Converse's conduct and, essentially, that an award of attorneys' fees will over-compensate Reebok for the difficulties of having to mount a hasty defense to the motion for contempt in light of the fact that no hearing was actually held until nearly four months after Converse initially filed its "emergency" motion. In making these arguments, Converse fails to account for the "aspect of bad faith" found by Judge Alexander, see Findings and Recommendations

at 9 n. 4, and ignores the legitimate punitive and deterrent purposes of sanctions. See United States v. Kouri–Perez, 187 F.3d 1, 8 (1st Cir.1999) ("[N]ormally there is much to be said for deploying the least extreme sanction reasonably calculated to achieve the appropriate punitive and deterrent purposes.").[2] Clearly, counsel for Converse has not taken responsibility for what the magistrate judge found was a "deliberate choice to disregard the rules of the District Court," see Findings and Recommendations at 7, and instead euphemistically characterizes the attempt to blindside Reebok with an emergency motion filed the Friday before a holiday weekend as a mere "failure to wait," see Converse Inc.'s Objections, Docket No. 37, at 16. Moreover, Converse's argument that Reebok suffered no prejudice is, for the reasons stated in the Findings and Recommendations, irrelevant. The purpose of Rule 7.1 is to conserve judicial resources by encouraging parties to narrow the contours of disagreement before bringing their dispute to the court. Rule 7.1 does not have a "no harm, no foul" escape clause.

While I think sanctions are appropriate, I respectfully disagree with Judge Alexander that such sanctions should be measured necessarily by the attorneys' fees and costs incurred by Reebok.[3] There is nothing in the record to indicate that, had Converse complied with Rule 7.1, Reebok would have incurred no fees and costs in defending against the motion for contempt. Furthermore, as Judge Alexander observed, the failure of Converse to comply

---

**2.** In its efforts to avoid sanctions, Converse misstates the standard for the imposition of sanctions by eliding a critical concept. On page 16 and again on page 18 of its brief, Converse selectively quotes from *Kouri–Perez* for the proposition that the court should impose the "least extreme sanction," making no mention of the twin principles of punishment

and deterrence which the full quote notes as purposes of sanctions of the kind involved here.

**3.** Reebok claims that its fees and costs attributable to filing an initial opposition to the present motion total $43,389.43.

with Rule 7.1 is an "offense ... that harms the District Court as much as Reebok." Findings and Recommendations at 8. Indeed, as suggested above, the rule was designed *primarily* for the benefit of an overburdened district court, because it forces the parties to present issues for resolution by the court only where agreement is not possible after good faith consultation. A sanction in the amount of $15,000 will send the appropriate message that Rule 7.1 is no trifle, and that the court expects compliance with both the letter and spirit of its requirements.

Accordingly the motion for contempt is DENIED. Converse will pay to the clerk of this court $15,000 as a sanction for its failure to comply with Rule 7.1. The payment is to be made not later than thirty days from the date of this order.

IT SO ORDERED.

## FINDINGS AND RECOMMENDATION ON PLAINTIFF'S MOTION FOR CONTEMPT AND ENFORCEMENT OF THE CONSENT JUDGMENT AND ORDER (Docket # 15)

ALEXANDER, United States
Magistrate Judge.

This is an action that arose from a complaint filed in the District Court by Converse Inc. ("Converse") on December 19, 2001. Therein, Converse alleged that the defendant, Reebok International Ltd. ("Reebok"), was infringing on Converse trademarks, unfairly competing, and diluting the Converse "ALL–STAR" trademark by marketing and distributing athletic shoes bearing the imprint "ALL–STAR" on the heels of Reebok shoes. Converse sought, *inter alia,* a temporary restraining order and preliminary injunction. In full court press mode, Converse also moved for "short order" of notice.

The case was drawn to Judge Lindsay, who allowed the motion for short notice, expedited the matter, and promptly scheduled the parties for hearing. On the morning of December 21, 2001, counsel for the parties appeared before the District Court for hearing. At hearing, and without an admission of liability by Reebok, counsel presented the District Court with an assented-to motion for a temporary restraining order. Judge Lindsay allowed the assented-to motion, and apparently granted the parties until December 28, 2001 in which to reach further agreement on disposition. Ostensibly, the parties conferred and concurred: the District Court entered a "consent judgment/decree" for Converse against Reebok on December 28, 2001. The consent decree, essentially, prohibits Reebok from using certain Converse trademarks, including those incorporating the words "ALL–STAR" and those that use a five-pointed star. The case was closed that day.

The matter remained dormant until Friday, January 16, 2004. That day, Converse filed an "emergency" motion in the District Court to shorten the time for a concomitantly filed motion for contempt and to enforce the consent judgment previously entered by Judge Lindsay in December 2001. The motions were accompanied by extensive legal memoranda and affidavits, a certificate of compliance regarding Local Rule 7.1, and other materials. Converse's papers suggested that a new dispute was extant.

The dispute implicates a contractual relationship between Reebok and the National Basketball Association ("NBA"), which licenses Reebok to create and provide apparel to NBA players and to market similar apparel commemorating the annual NBA All–Star Game ("All–Star Game") to the general public. It appears that Reebok previously marketed some such apparel, without objection by Converse, in 2002 and 2003.

In January 6, 2004, the March 2004 edition of *Slam*, a magazine alleged to be "an authoritative publication in the basketball industry," was distributed. That edition of *Slam* carried advertisements in its "Kicks on Court" section indicating that Reebok was offering two new shoe styles, the "REEBOK NBA DOWNTIME ALL-STAR GRAFFITI" (the "Graffiti shoes") and the "REEBOK CLBB46 LEATHER ALL-STAR EDITION" (the "Leather shoes"),[4] for sale in February 2004. After seeing these advertisements, which bore photographs and/or illustrations of the shoes, Converse believed that the shoes' designs impermissibly infringed on its trademarks and were forbidden by the consent decree. Converse further believed that Reebok was marketing the shoes in conjunction with the then-impending 2004 All-Star Game, which was to be held on February 15, 2004 in Los Angeles, California.

Significantly, at hearing before this Court, counsel for Converse admitted that his client was aware of the advertisements soon after *Slam* was released in early January 2004. Soon thereafter, counsel and client began to look at the legal issues identified and analyzed in the motion Converse eventually filed. Converse's counsel, however, did not raise the issue with Reebok at the time. Rather, Converse first informed Reebok's counsel via voicemail that it was filing the instant motions alleging trademark infringement and breach of contract approximately thirty minutes prior to the actual filing of the papers—more than a week after it first learned of the alleged claims.

Upon receiving Converse's motion, the District Court again fast-tracked the case; on January 20, 2004, Judge Lindsay issued a notice of conference directing the parties to appear on the morning of January 22, 2004. At the conference, he permitted Reebok until January 26, 2004 to file oppositions to Converse's motions. (In the interim, motions for *pro hac vice* appearances and reply briefs were filed and allowed.)

Reebok's opposition to the motion for contempt contends that 1) the marketing of the Graffiti and Leather shoes does not violate the consent decree; and, alternatively, that 2) portions of the consent decree, including paragraphs 3(a) and 3(b), are unenforceable due to ambiguity and/or lack of specificity. Reebok also opposes on the ground that Converse failed to make a good faith effort to avoid or limit the dispute, or to otherwise confer, before filing the motion—a violation of Local Rule 7.1.

In an effort to respond to the parties' counsel's requests for immediate hearings, the District Court continued to move the case as expeditiously as possible. Because of the parties' claims that the case was temporally sensitive, i.e., the All-Star Game was to be played soon, the District Court referred the matter to this Court. This Court also moved the case promptly, scheduling a hearing on the matter for February 13, 2004.

Despite the parties' prior representations that time was of the essence, at the hearing before this Court, counsel appeared and stated that they had reached an interim agreement through which Reebok would temporarily suspend any advertising, other marketing, or sales of the Graffiti and Leather shoes. This Court ordered further briefing on the case, continued the matter at the request of the parties and provided another date for hearing. Thereafter, the Court was pre-

---

4. There is some dispute in the papers as to the proper names of the products at issue here. The Court uses those terms used by the movant for ease of reference in these Findings and Recommendations.

sented with another request for a continuance. The Court also allowed that motion and continued the matter to May 6, 2004 for hearing. Counsel were heard that day, and this Court has the benefit of a full record and oral arguments. The Court now addresses the issues raised.

## ANALYSIS

### The Issues Related to Local Rule 7.1

Local Rule 7.1 states, "No motion shall be filed unless counsel certify that they have conferred and have attempted in good faith to resolve or narrow the issue." Local Rule 7.1. Attorney Anthony Mirenda, counsel for Converse, filed the requisite certification on January 16, 2004, along with Converse's Motion for Contempt, stating "I hereby certify that I have attempted to confer with counsel of record for Defendant, but have been unable to obtain Defendant's assent to this motion."

Reebok complains that Converse's purported attempt to confer consisted entirely of a message, left on Reebok's counsel's voice mail, 29 minutes prior to filing the motion.[5] Reebok contends that this perfunctory attempt to comply, accompanied by the uncompromising language concerning the contempt motion, hardly qualifies as a good faith effort to confer with counsel in an attempt to resolve or narrow the issues prior to the filing of the motion. Reebok requests that sanctions be imposed against Converse in the form of summary denial of the instant motion, as well as attorney's fees.[6]

Converse offers various justification for its actions. It first contends that Converse believed immediate action was necessary to prevent Reebok from putting some or all of the allegedly offending shoes in the hands of distributors or retailers. It next avers that inasmuch as Reebok was unlikely to admit it was in contempt of the consent agreement, any conference would have been futile. Finally, it asseverates that Reebok did not suffer prejudice, because it was granted approximately one week to respond to the motion. Converse's assertions fall short of any proper justification for dereliction of its obligations pursuant to the rules. A foul was indeed committed.

---

**5.** Attorney Shepard Davidson, counsel for Reebok, avers without dispute by Converse that the message left was as follows: "Good morning Shep, this is Tony Mirenda from over at Foley Hoag. You may remember me from a couple of years ago, you represented Reebok and I represented Converse in a trademark matter that we settled with a consent judgment and order entered against Reebok. I am calling because we have just learned that Reebok is in violation of that consent judgment and order. There are two sneakers in Slam magazine's March issue that I think pretty clearly violate the order. They are called All Star Shoes and they use Converse's five, they use the five-pointed star design on their sidewalls and so I am calling to let you know that we are bringing today a motion for contempt of that court order against Reebok. I will get a package by hand delivery over to you right away this morning. I am certainly willing to talk, I obviously don't expect you to assent to the motion for contempt and so I haven't indicated that but we are filing it today. I am asking by way of an emergency motion for a hearing as soon as possible next week. I have asked for next Wednesday but that's going to be up to Judge Lindsay, and what his schedule is and I don't know that so, sorry to be the bearer of bad news on a Friday but please give me a call [] if you want to discuss any of this. Thanks."

**6.** At hearing, counsel for Reebok expanded on the request for sanctions, suggesting that Converse be forced to pay for any damages flowing from the decision to withhold the Graffiti and Leather shoes from the marketplace before the All–Star Game. In that counsel for both parties previously appeared before this Court and signified agreement on the decision to withhold the shoes and to continue the hearing on the merits, this Court FINDS no basis for allowing Reebok's request for damages.

With regard to the first defense—that Converse needed to take immediate action—the record here negates a finding that there was not time for counsel to confer. Converse admits that the issue of *Slam* magazine from which Converse learned of Reebok's allegedly offending shoes was published approximately ten days before the filing of the instant motion. That fact alone belies the purported urgency of the motion and the suggestion that time did not permit a good faith effort to meet and confer prior to filing the motion. Counsel had sufficient "hang time" to discuss the issues presented in the motion at any time during the period between learning of the Reebok advertisements in *Slam*, conferring with clients, and preparing the papers. The motion for contempt, accompanying memorandum, and accompanying affidavits, by virtue of their size and level of detail, clearly are not the result of a last minute "fast break" to the courthouse. Converse had ample time to fully comply with Rule 7.1, but made no effort to do so. It was a deliberate choice to disregard the rules of the District Court—the equivalence of a "technical" foul.

With regard to the other two justifications—that Reebok was unlikely to admit contempt, and that Reebok suffered no actual prejudice—Converse does not cite, nor is the Court aware of, any case which has accepted either excuse as sufficient justification to avoid sanctions. Although it might be true that Reebok would be unlikely to admit it was in contempt of the consent decree, there could have been fruitful discussions to narrow the issue. Indeed, this Court notes that the same counsel at issue here previously were able to not only discuss the conflict presented by this case, they were able to resolve it— as evidenced by the original consent judgment in 2001. Though new issues may now be extant, counsel were able to reach agreement about certain aspects of it prior to the All–Star Game and the first continuance that they sought in the wake of that agreement. Thus, this Court believes that Converse's counsel's suggestions of futility are more the result of self-fulfilling prophecy than genuine justification. This Court expects more from counsel, and the Local Rules demand more than hollow efforts to comply with their dictates.

To the extent that Converse claims Reebok suffered no prejudice, the suggestion is not compelling. Essentially, Converse seeks to shift the burden to Reebok to show prejudice. Nothing in the rule's rationale or its text indicates any propriety in that tack. Indeed, the issue here is one of non-compliance with the Local Rules promulgated by the District Court. Though Reebok may be the witness to the offense, the offense is one that harms the District Court as much as Reebok. Sanctions of some kind are warranted.[7]

After due consideration on the issue of sanctions, this Court RECOMMENDS that sanctions be imposed in the form of

---

**7.** On that issue, Reebok asks the Court to summarily deny Converse's motion and to award attorneys' fees. There is some appeal to the request, but this Court is mindful that although "a litigant's failure to observe the Local Rules invites sanctions, omitting to confer prior to filing a motion certain to be opposed does not warrant so severe a sanction as summary denial." *Gerakaris v. Champagne*, 913 F.Supp. 646, 651 (D.Mass.1996). *See also Edwards v. New England Telephone*, 86 F.3d 1146, 1996 WL 267276 (1st Cir.1996)

(*per curiam* and unpublished) (approving of the district court's analysis in *Gerakaris*). That said, this Court believes that there is an aspect of bad faith present here that was not present in *Gerakaris*, and accordingly, that at least in principle, summary denial of Converse's motion may not be wholly inappropriate even in light of that holding. As explained more fully below, however, this Court is not persuaded by Converse's arguments on their merits. As such, a more reasonable sanction of attorneys' fees is *apropos*.

attorneys' fees and costs incurred by Reebok in defending the motion for contempt. This Court thus ORDERS that counsel for Reebok prepare and file, within ten (10) days of receipt of these Findings and Recommendations, an affidavit setting forth the reasonable attorneys' fees and costs incurred in the initial opposition (i.e., the costs and fees incurred between the receipt of the voice mail on January 16, 2004 and the time the agreement was reached by the parties' counsel on February 13, 2004) of Converse's motion for contempt. After review of the reasonableness of the fees and costs requested, the District Court or this Court may then make such an award.[8]

The Court now turns to the merits of the contentions raised by counsel.

### The Elements and Burden of Proof for Civil Contempt

 To establish a claim for civil contempt, the complainant must "establish by clear and convincing evidence that the particular defendant violated an unambiguous consent decree that left no reasonable doubt as to what behavior was to be expected." *Gilday v. Dubois,* 124 F.3d 277, 282 (1st Cir.1997) (internal quotes and citations omitted). *See also AMF Inc. v. Jewett,* 711 F.2d 1096, 1100 (1st Cir.1983). The determination of whether a violation occurred consists of a two-step analysis: 1) construction and interpretation of the consent order itself; and 2) determination of whether the challenged conduct falls within the order's proscription. *United States v. Boston Sci. Corp.,* 167 F.Supp.2d 424, 430 (D.Mass.2001). The Court addresses the binary inquiry *seriatim.*

 Construction of a consent order is analogous to construction of a contract and follows the ordinary principles of contract interpretation. *AMF,* 711 F.2d at 1100 (*citing Mass. Assoc. for Retarded Citizens, Inc., v. King,* 668 F.2d 602, 607 (1st Cir.1981)). Additionally, the consent decree should be construed so as to effectuate the intent of the parties who negotiated it. *Boston Sci.,* 167 F.Supp.2d at 430.

 In contempt proceedings, courts typically look to the four corners of the order allegedly violated, *Goya Foods, Inc. v. Wallack Management Co.,* 290 F.3d 63, 76 (1st Cir.2002), because "the party enjoined must be able to ascertain from the four corners of the order precisely what acts are forbidden." *Gilday,* 124 F.3d at 282 (citations omitted). As in general contract law, courts may rely on information external to the literal text of the document to aid them in understanding its meaning. Such information may include "the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree." *United States v.*

---

8. In so ordering, the Court notes that at hearing on this matter, counsel for Converse stated that if this Court finds an award of attorneys' fees to be warranted, he requested that the sanction be imposed upon him personally rather than upon his client or his firm. This Court has not hesitated to make counsel personally responsible for the payment of attorneys' fees in cases where the conduct giving rise to the sanctions was conduct for which counsel (rather than client and/or firm) was responsible. In this case, however, the Court is not presented with sufficient information to make such a determination. Although there is not doubt that Attorney Mirenda was, or should have been, fully aware of the requirements of Local Rule 7.1, *see Hasbro, Inc. v. Serafino,* 168 F.R.D. 99 (D.Mass.1996) (wherein Attorney Mirenda was counsel of record for plaintiff and argued that the defendant's motion should be denied for failure to comply with the meet and confer obligations of Local Rule 7.1), it is not clear that it was his decision alone to ignore its mandate. Thus, the Court does not RECOMMEND that the sanction be imposed on Attorney Mirenda personally.

*Charter Int'l Oil Co.,* 83 F.3d 510, 517 (1st Cir.1996).

■ Initially, pursuant to the principles of contract interpretation, this Court must determine whether the contract is ambiguous. 11 *Williston on Contracts* § 30:4 (4th ed.2003). This step is particularly important in a contempt proceeding because of the severity of the consequences that flow from violating the terms of the consent order. "Because of the greater significance and the more serious consequences that the law attaches to violation of a court decree, it imposes requirements that the decree be specific, and it refuses to read ambiguities against a defendant." *NBA Properties, Inc. v. Gold,* 895 F.2d 30, 34 (1st Cir.1990). Thus, the Court must ensure that the consent decree conforms to the strictures of Federal Rule of Civil Procedure 65(d), which requires that orders of this type "be specific in terms" and "describe in reasonable detail the act or acts sought to be restrained."

A contract is ambiguous if it is susceptible to reasonable alternative interpretations. *Sportfolio Publications, Inc. v. AT & T Corp.,* 320 F.3d 75, 79 (1st Cir.2003). "In determining whether a contract is ambiguous, the court begins with its plain language, construed in harmony with the plain and generally accepted meaning of the words used, with reference to all of the agreement's provisions." 11 *Williston on Contracts* § 30:5 (internal citations omitted). Although some courts take the position that the ambiguity must be apparent from the face of the document, the prevailing view is that courts may take into account "objective indicia ... that the contract's terms are susceptible to different meanings." *Id.* Such indicia might include the "structure of the contract, the parties' relative positions and bargaining power, the bargaining history ..., and any conduct of the parties which reflects their understanding of the contract's meaning." *Id.*

■ With such law in mind, the Court turns to the judgment at issue noting that the parties agree that the sections of the consent decree relevant here are paragraphs 3(a) and 3(b).

Paragraph 3(b)is relatively straightforward. It prohibits Reebok from:

> using in any manner in connection with the ... sale ... of ... footwear ... any colorable imitation of the Converse Trademarks, or any other false designation of origin, or false representations, or otherwise commit any acts of unfair competition or deceptive trade practices which may lead the public to believe that a product not originating with Converse is Converse's product or that Defendant's products are authorized by, affiliated with or approved by Converse.

The parties are not in great conflict as to the meaning of the terms in this section of the decree.

Paragraph 3(a) is a bit more challenging to interpret. It prohibits Reebok from:

> using in any manner in connection with the manufacture, distribution, promotion, marketing, advertising, sale or offer for sale, of any footwear or clothing product (or eyewear or sports bags or packs), the designation or mark ALL–STAR, the Converse Trademarks or any other name, term, phrase, mark, device or symbol which resembles or is similar to the [specifically defined] Converse Trademarks so as to be likely to cause confusion, mistake or deception as to source, origin, sponsorship, approval, affiliation or the like ....

In the first line of paragraph 3(a), the clause "in any manner" functions as an adverb modifying either the gerund "using" or the adverb "in connection with...." There is no rule of grammar or

any extrinsic evidence to help resolve this ambiguity but Converse contends, and Reebok does not oppose, that the phrase "in any manner" modifies the gerund "using."[9] This Court therefore adopts such an interpretation.

As with the term "in any manner," the parties are in agreement as to the meaning of the terms "mark" and "designation." As in the Lanham Act, the term "mark" is defined as a word, name, symbol, or device which functions as a source identifier, and "designation" is such a word, name, symbol or device which *could* function as a source-identifier if it were so used. A logical consequence of this definition is that the term "designation" necessarily is broader than the term "mark" in the sense that all marks are designations, but some designations are not necessarily marks.

The language of paragraph 3(a) closely tracks the language of the Lanham Act, which provides a cause of action against one

who, in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods . . . .

15 U.S.C. § 1125(a). In comparing the language of this section of the Lanham Act to paragraph 3(a) of the consent decree, it appears that paragraph 3(a) is legally equivalent to the requirement that Reebok not violate § 1125(a) with regard to Converse's trademarks.

Having considered the language above, the Court FINDS that Reebok's contention that the decree is ambiguous fails. Although the parties are in conflict as to whether the decree prohibits Reebok from using the term "ALL–STAR"for any purpose (as Converse suggests) or simply from using the term "ALL–STAR" as a designation or mark (as Reebok avers), such dispute does not render the decree ambiguous. Rather, this Court FINDS that the language of the decree is unambiguous. This Court further FINDS that when the decree is read in its entirety, with "a fairly literal interpretation," *see AMF*, 711 F.2d at 1101, and with common grammatical sense rather than by selective semantic dissections, it is reasonably susceptible to only one interpretation: that Reebok is forbidden from using the term "ALL–STAR" as a designation or mark such as to cause consumer confusion as to the source of the product.

Such a finding is supported not only by the language itself, but by the circumstances surrounding the creation of the decree. In so noting, the Court is mindful of the product at issue in the original suit—shoes that bore the term "ALL STAR" on their heels. There is some appeal to the suggestion that the use and placement of that term on Reebok's shoes could cause consumer confusion as to the shoes' source. At the time Reebok ceased marketing that product and entered the decree voluntarily, it likely recognized that possibility of confusion. In doing so, however, Reebok was actively engaged in its contractual relationship with the NBA— and that relationship permitted Reebok to market and sell products related to the All–Star Game. It would be incredible to believe that at the time Reebok entered

---

**9.** The effect of the clause "in any manner" is to broaden the scope of the term it modifies. Pursuant to this construction, the Court treats events which may constitute "use" with less skepticism than events which may show such use "in connection with [the listed activities]."

the decree, it would have intended to forego any use of the term "ALL STAR" when that term was directly related to a valuable (and likely lucrative) marketing opportunity—the All–Star Game. Moreover, it is equally incredible that had Converse believed that any use of the term "ALL STAR" was verboten, that it would have sat by idly during 2002 and 2003 when Reebok was openly marketing and distributing other products related to the All–Star Game.

The interpretation completed, the Court moves forward with additional analysis. In doing so, the Court begins with Federal Rule of Civil Procedure 65(d), which mandates that a consent decree "shall be specific in its terms" and "shall describe in reasonable detail ... the act or acts sought to be restrained." This requirement reflects congressional acknowledgment that the judicial contempt power is a "potent weapon," and therefore the requirements for compliance with the decree must be clearly delineated if one is to avoid the serious consequences of being found in contempt. *Int'l Longshoremen's Ass'n, Loc. 1291 v. Philadelphia Marine Trade Ass'n,* 389 U.S. 64, 76, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967).

■ Applied here, this Court FINDS that notwithstanding the unambiguous nature of the decree, the quoted part of paragraph 3(a) and the entirety of paragraph 3(b) fail pursuant to Rule 65(d) for lack of specificity. The requirements in those paragraphs are "do not break the law" admonishments. There is nothing *per se* wrong with such an order, particularly in a simple case. But it is of limited value in a complex case of the nature presented here because the language within the consent decree is largely a recitation of statutory language.

Converse cites *Wolfard Glassblowing Co. v. Vanbragt,* 118 F.3d 1320, 1323 (9th Cir.1997), for the proposition that these clauses are enforceable. True, the court in *Vanbragt* upheld a finding of contempt in violation of a similar type of consent decree. But reliance on that holding in this case is misplaced for two reasons.

First, the party ultimately held in contempt in the *Vanbragt* admitted previously to infringing on the underlying consent decree. Reebok makes no such stipulation in the instant case. The distinction is critical here because in *Vanbragt* the offending party clearly had a concrete understanding of an *example* of an infringing item prior to entering into the consent decree, and because the item which resulted in a finding of contempt was a trivial variation of the original item. Second, and as importantly, the issue raised on appeal in *Vanbragt* related to the propriety of the district court's findings that the defendant's product was a "colorable imitation" of the plaintiff's product—*not* whether the consent decree was unenforceable due to lack of specificity, a critical issue here. The instant case is thus factually and legally distinguishable to *Vanbragt* and the other authority cited by Converse.

Here, the Court FINDS that Converse fails to discharge its burden of establishing that the language was sufficient to put Reebok on notice of the specific act or acts to be restrained or forbidden. This Court concludes that paragraph 3(b) of the consent decree is unenforceable due to noncompliance with the specificity mandates of Rule 65(d). Having set aside that portion of the decree, what remains is, in pertinent part, a proscription on Reebok from "using ... the designation or mark ALL–STAR, [or] the Converse Trademarks." The Court now addresses that aspect.

■ A fundamental tenet of trademark law is that marks must be considered as a whole. *Aura Communs., Inc. v. Aura Networks, Inc.,* 148 F.Supp.2d 91, 94

(D.Mass.2001); *Coca–Cola Co. v. Snow Crest Beverages,* 162 F.2d 280, 283 (1st Cir.1947). This Court FINDS that the appearance of the *phrase* "ALL–STAR" in the *designation* "REEBOK NBA DOWN-TIME ALL–STAR GRAFFITI" is not tantamount to the use, in any manner, of the *designation* "ALL–STAR" in connection with the accused shoes. Nor does it appear that Reebok is using any of the Converse trademarks. Converse complains of Reebok's alleged use of two trademarks on the Leather shoes—that related to registration number 1,138,469 (depicting a circular medallion with a five-pointed star and the words "Chuck Taylor" and "All Star," hereinafter "the emblem mark") and that related to registration number 1,490,262 (depicting the placement of a circular patch on the ankle of the shoe, hereinafter "the placement mark"). These complaints miss the basket.

With regard to the emblem mark, a visual inspection and comparison of the emblem mark to Reebok's accused mark [10] reveals stark differences between the marks. For example, Reebok's mark contains the letters "04" and "LA" above and below the star, respectively; Reebok's mark also contains the familiar "NBA dribbler" logo within the star. The Court is not at all persuaded that indicia of infringement, such as likely consumer confusion, is a "slam dunk." More critically, the Court FINDS expressly that Converse does not present sufficient evidence that the Reebok design is an impermissible infringement upon the Converse emblem mark. Similarly, with regard to the placement mark, i.e., the placement of a circular ankle patch on the side of the shoe, the Court FINDS that Converse does not present clear and convincing evidence that Reebok's design violates any protection af-

forded to Converse's placement mark or is otherwise likely to cause confusion, mistake, or deception as to source, origin, or sponsorship.

Thus, after careful consideration of the pleadings and arguments of counsel, and given this Court's FINDINGS, the Court RECOMMENDS that the District Court DENY the Plaintiff's Motion for Contempt.

SO ORDERED.

---

**10.** This Court notes that counsel in the case took great care to present the Court with excellent reproductions of the products at is-

sue, and that as the Court has carefully viewed and reviewed the submissions.